In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2365

ESTATE OF RUDY ESCOBEDO, (Deceased)
(Raquel Hanic, Personal Representative of Estate),

*Plaintiff-Appellee*,

*v.*

MARTIN BENDER, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 05 C 0424—**Theresa L. Springmann**, *Judge.*

ARGUED JANUARY 22, 2009—DECIDED APRIL 5, 2010

Before MANION and KANNE, *Circuit Judges*, and
KENDALL, *District Judge.**

KENDALL, *District Judge.* Raquel Hanic, the personal
representative of the estate of Rudy Escobedo ("the Es-

* Hon. Virginia M. Kendall, District Judge for the Northern
District of Illinois, is sitting by designation.

tate"), filed suit pursuant to 42 U.S.C. § 1983 and Indiana state law against the City of Fort Wayne and against individual members of the Fort Wayne Police Department. Hanic asserted that the individual officers used excessive force against Escobedo when they deployed tear gas into his apartment in an attempt to extricate him from the unit where he had isolated himself threatening to commit suicide. After refusing to come out, the officers used additional tear gas and flash bang grenades to enter the apartment, setting fire to the exterior room before throwing the flash bang grenades into the darkened bedroom inches from Escobedo's head rendering him blind and deaf before shooting him to death. The Defendant Officers filed a motion for summary judgment asserting, among other things, that they were entitled to qualified immunity for their actions. The district court denied the motion, in part, finding that the officers were not entitled to qualified immunity for the entry with the tear gas and flash bang devices. The officers then filed this interlocutory appeal. For the following reasons, we affirm.

## I. Background

We begin by setting forth the facts as the district court found them, that is, in the light most favorable to the Estate. *See Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *see also Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (Appellate court's review of a denial of qualified immunity is framed either by the facts as assumed by the district court or by the facts as set forth by the plaintiff).

On July 19, 2005, at 4:24 a.m., Rudy Escobedo ("Escobedo") dialed 911. He told the dispatcher that he was armed with a gun and wanted to shoot himself. He also told the dispatcher that he was high on cocaine. During the 911 call, Escobedo asked the dispatcher to contact his psychologist and he provided the dispatcher with the psychologist's phone number. Throughout the conversation, Escobedo expressed that he was seeking help and that he desperately needed to talk to someone. Escobedo stated that while he was contemplating killing himself, he had no intention of harming anyone else including the police. Escobedo never made any explicit threats to the police or other persons during the call stating instead, "I'm not going to hurt anybody"; and "I just want help." In summarizing the overall tone of the 911 call, the district court made the factual determination that Escobedo was in despair about his drug addiction and his life in general and was suicidal.

Sergeant C.M. Taylor ("Taylor") (not a defendant in the present lawsuit) was the first officer to speak with Escobedo after the 911 call via his personal cell phone. Taylor called Escobedo at 4:55 a.m. and Escobedo informed him that he was armed and planned to commit suicide. After approximately twenty-five minutes, Taylor decided to contact the Crisis Response Team ("CRT") and the Emergency Response Team ("ERT") to respond to the situation.

Once the CRT and ERT arrived, Taylor transferred the phone call with Escobedo to Bernard Ebetino ("Ebetino"), a negotiator for CRT. Ebetino took over negotiations

with Escobedo at 5:42 a.m. Escobedo repeated that he was suicidal and armed, asked again to speak with his psychologist and said that he wanted help and medicine for his drug addiction. At 6:23 a.m., the CRT began using a "direct link phone system," a device that allowed several other officers on the seventh floor to listen to the conversation between Escobedo and Ebetino; however, the CRT did not follow protocol for handling the systematic overview of negotiations in that the CRT commander relied on information from officers near the mobile direct link phone system. Normal procedures called for the CRT commander to listen to the negotiations via the direct link system. As a result, the CRT commander did not always learn about important information and accordingly could not inform the scene commander and the ERT commander about such information. For instance, as the district court pointed out, the CRT commander did not recall hearing or learning that Escobedo had removed objects from his apartment door, something that would have been considered a sign of progress.

When this switch was made, Ebetino stopped using Taylor's cell phone and began using another officer's personal cell phone. Taylor's cell phone was not used again during the incident. There is no evidence in the record that Escobedo was told of the change of phones or given the new phone number in case the call was terminated. In fact, after the initial round of tear gas was fired into Escobedo's apartment, the record indicates that Escobedo attempted to call Taylor's cell phone multiple times with no success. Escobedo's com-

ments to Ebetino continued to include threats of suicide and a fear of being killed by the police. At times, the conversation took a positive turn and Ebetino believed Escobedo was close to surrendering. But Escobedo would always return to comments about suicide, fear of being killed by the police and his addiction. At one point, Ebetino told Escobedo that the police were trying to contact his psychologist and bring him to the scene so Escobedo could talk to him when he left his apartment. Eventually, Sergeant Kevin Hunter ("Hunter"), head of the CRT, spoke with Escobedo's psychologist but never invited him to the scene or asked him to assist. Hunter recalls that the psychologist told him that he did not think that Escobedo had a history of using weapons or attempting suicide.

Ebetino testified that during the negotiations, Escobedo did not make or constitute a threat to the police or to the public, except "the only indication . . . was when he said he wanted to come out of his apartment with the gun." This statement occurred at 8:28 a.m., which was after supervisors decided, at about 8 a.m. to fire tear gas into Escobedo's apartment and then make entry. At some moments, Ebetino believed Escobedo was barricading his door and at other moments it sounded as if Escobedo was removing the barricade by the door. At 7:27 a.m. he thought that Escobedo was removing the barricade from the door and he assumed (wrongfully) that this information was communicated to the commanders.

During the course of negotiations, Hunter, Lieutenant Kevin Zelt ("Zelt") (head of ERT), and Deputy Chief

Martin Bender ("Bender") (commander of the scene) discussed using tear gas against Escobedo. Bender had overall authority over the incident and scene, but relied on Zelt to choose the tactics against Escobedo and on Hunter for information regarding the negotiations. Hunter had to rely on information from other CRT members to supply to Bender. As mentioned previously, normal procedures call for Hunter to listen to negotiations via the direct link system, but he did not do so. At some point between 6:45 and 8 a.m. the idea of using tear gas was first broached. Bender later testified that the key factor in his decision to use tear gas on Escobedo was that by 8 a.m., "it was our belief that the negotiations were not going anywhere," pedestrian and vehicle traffic was increasing in the area, and Hunter had told him that Ebetino heard noises suggesting that Escobedo was barricading his apartment. Although Bender was not told that Escobedo had expressed that he was not going to hurt the police or anyone else, Bender believed that Escobedo was a threat to the public because of "the mere fact that he was armed with a weapon and threatening to commit suicide."

Zelt first suggested using tear gas against Escobedo as a "standard procedure" and "the next logical step" when communications or negotiations with a person are not succeeding and Escobedo was barricading and fortifying his position. Although Zelt stated that he believed Escobedo had made threats of some kind, the district court found that it was not clear that Zelt believed this at the time of the incident or formed that opinion after-wards. Regardless, Zelt could not identify any state-

ment Escobedo made that Zelt knew of at the time of the stand-off that constituted an explicit threat to the police or public. Bender also acknowledged that Escobedo had not committed any crime by the point in time that the tear gas was deployed. Zelt stated that the purpose of forcing Escobedo from his apartment with tear gas was not to arrest him but to take him into custody for a 24-hour emergency mental health detention. Zelt indicated that the decision to introduce tear gas was also motivated by his concern that his officers' readiness was deteriorating because it was hot outside. He chose 8:30 a.m. as the deadline for negotiations because he thought it was important to introduce the tear gas before the peak downtown hour although he was aware that most people working downtown were already at work by 8:30 a.m. Hunter concurred with Zelt's decision to use tear gas, focusing on the potential danger to the increasing number of persons who would be in the downtown area and near the hospital that was across the street from Escobedo's apartment building. Deputy Chief Douglas Lucker ("Lucker") was also on the scene at various points and participated in discussions with Bender, Zelt, and Hunter on the use of tear gas to force Escobedo from his apartment.

The district court also considered the testimony of Larry Danaher ("Danaher"), the Estate's expert in police practices. Danaher stated that based on his case review, Escobedo did not pose a threat to officers or the public that required the use of force and that the use of force was premature and based on flawed priorities. Danaher also said that he is familiar with enough traffic in Fort

Wayne to know it could have been rerouted with mini-
mal inconvenience, and that traffic concerns should not
have played a role in the decision to use force.

After learning that the police would deploy tear gas
against Escobedo, Ebetino continued to negotiate. The
police did not inform Escobedo of the plan to deploy gas
against him. At 8:28 a.m., Escobedo told Ebetino he
was going to come out of the apartment but was going
to bring the gun with him. At 8:30 a.m., Escobedo again
conveyed that he would come out of his apartment in
three minutes. Ebetino conveyed to fellow members of
the CRT that he wanted another three minutes to
negotiate with Escobedo. Ebetino did not ask for more
time beyond that three minute reprieve, and he did not
ask other members of the CRT to inform the commanders
that Escobedo would surrender if Ebetino were given
more time to negotiate. After those three minutes elapsed,
Ebetino believed that Escobedo was not going to come out.

As the police prepared to fire tear gas grenades into the
apartment, Ebetino was told by one of the commanders
at the scene to wind down the conversation with
Escobedo. Hunter testified that Ebetino ended his phone
call with Escobedo before the gas was deployed and
that this was not in accordance with normal procedures.
As the deadline approached, the ERT officers put on
their gas masks. Sergeant Tim Selvia ("Selvia"), who led
the ERT entry team, stated that wearing the gas mask
makes it difficult to communicate because it muffles
one's voice. Danaher stated that gas masks distort offi-
cers' voices and make commands sound distorted
and sometimes indecipherable.

Zelt calculated what he thought would be an "incapacitating concentration" of chemicals for Escobedo's apartment. He chose six .37 millimeter liquid rounds, six .37 millimeter Sage powder, and five or ten .12 gauge munitions. At 8:33 a.m., Officer Brian Martin ("Martin") and two other officers fired the tear gas rounds into the windows of Escobedo's apartment. After the first round of tear gas was fired, police waited about ten minutes before Zelt ordered officers to fire the second round of chemical agents into Escobedo's apartment. According to Ebetino, after the first round of tear gas had been fired, the fumes became too strong for him to continue negotiating with Escobedo, forcing him and other CRT members to leave the seventh floor of Escobedo's apartment building without their communication equipment. This cut off all communication with Escobedo. Zelt stated that it is not standard for a negotiator to leave the scene after chemical agents or gas are used against a subject, but it occurred here because Ebetino's point of negotiation was unusually close to Escobedo's apartment, and Ebetino did not have a gas mask. While the tear gas rounds were being fired into Escobedo's apartment, Escobedo tried to call Officer Taylor's cell phone, the phone that was originally used to communicate with him. Escobedo attempted to contact the police five times: at 8:34 a.m., 8:36 a.m., 8:39 a.m., 8:43 a.m., and 8:45 a.m. After all of the chemical rounds had been fired, there was twelve times the incapacitating concentration of tear gas in Escobedo's apartment. Danaher said that amount "was clearly and obviously excessive."

After the second round of tear gas was fired into Escobedo's apartment, police waited another ten minutes and then decided to breach the apartment door and deploy "clear out" canisters containing more tear gas. The ERT entry team included Officers Selvia, Martin, Jason Brown ("Brown"), and Scott Straub ("Straub"). All of the officers, except for Brown, were armed with MP5 submachine guns, a Glock handgun, or both. Brown was carrying a shoulder-fired weapon that shoots beanbag rounds meant to stun or disable a person. After using a ram to open the door, the officers threw a "clear out" canister of tear gas, waited a few minutes and then, after receiving no response, threw a second canister of tear gas. After still receiving no response, the ERT team prepared to enter the apartment. Upon entering Escobedo's apartment the ERT team threw a flash bang grenade. When the flash bang grenade explodes, it yields an intense light and extremely loud sound. The explosion from the flash bang grenade ignited the propellant of a tear gas canister and started a fire in Escobedo's apartment. The ERT team extinguished the fire once inside the apartment. After realizing that no one was in the main room or the kitchen, the ERT team determined Escobedo was in the bedroom. They yelled for him to surrender but received no response. At this point, the officers took a ram and began to force the bedroom door open. As the officers worked to push the door open, they heard Escobedo yell several times that he had a gun and that it was pointed at his own head. Once the officers were able to get the door slightly open, they threw a flash bang grenade into the bedroom. The room was "pitch black"

when the flash bang was thrown into the room. The flash bang grenade exploded in the front of, or just inside, the bedroom closet where Escobedo was located. The door eventually broke, and all of the officers entered the bedroom. Escobedo continued to yell that he had a gun and that it was pointed at his own head. The officers eventually located Escobedo, who was sitting on the floor of the closet with a gun pointed upside down at his own head. Martin ordered Escobedo to drop the gun and when Escobedo began to lower the gun, Martin fired because he was in fear of his own life. When Brown heard Martin order Escobedo to drop his gun, he too began to fire his weapon at Escobedo in an attempt to disarm him. Escobedo was declared dead at the scene a short time later.

Danaher, the Estate's expert, stated that the Officers disregarded the danger of flash bang grenades when they threw one into the bedroom and it exploded a few feet from Escobedo's head, certainly rendering him both blind and deaf at the time he was shot.

On December 20, 2005, Raquel Hanic, as Personal Representative of the Estate of Rudy Escobedo ("the Estate") filed a complaint under 42 U.S.C. § 1983 alleging, among other things, that Deputy Chief Martin Bender, Deputy Chief Douglas Lucker, Sergeant Kevin Hunter, Lieutenant Kevin Zelt, Officer Brian Martin, Officer Jason Brown, Officer Scott Straub, Sergeant Tim Selvia, Officer Derrick Westfield, Sergeant Shane Lee and Officer Bernard Ebetino violated Escobedo's constitutional rights by using excessive force against him when

they deployed tear gas and flash bang grenades during the July 19, 2005 standoff. On January 22, 2007, Defendants Lee and Westfield were dismissed from the case. The remaining Defendants moved for summary judgment, arguing in part that they were entitled to qualified immunity. The district court granted in part and denied in part the Defendant Officers' motion for summary judgment. Specifically, the district court dismissed Defendant Ebetino from the case, and granted summary judgment for the Defendants on the Estate's excessive force claim against Martin and Brown for the fatal shooting of Escobedo, the Estate's failure to train claim, the Estate's warrantless entry claim, the Estate's substantive due process claim and the Estate's state law wrongful death claim. The district court denied the Defendants' summary judgment with respect to the Estate's excessive force claim against Martin for firing tear gas into Escobedo's apartment; the Estate's supervisory liability claim against Bender, Lucker, Zelt, and Hunter, for the tear gas fired into Escobedo's apartment; the Estate's excessive force claim against the entry team—Selvia, Martin, Brown, and Straub—for the raid on Escobedo's apartment and bedroom with tear gas and flash bang grenades; and the supervisory liability claim against Bender, Lucker, Zelt, and Hunter, for the entry team's raid on Escobedo's apartment. In denying the summary judgment on these claims, the district court found that the Defendant Officers were not entitled to qualified immunity. The individual officers, Bender, Lucker, Zelt, Hunter, Martin, Selvia, Brown and Straub, now appeal the district court's denial of qualified immunity.

## II. Discussion

### A. Qualified Immunity

The only question before us on this appeal is whether, taking the facts as the district court presented them, the district court erred in finding that the individual officers were not entitled to qualified immunity for their decision to use tear gas to extricate Escobedo from his apartment and their decision to use more tear gas and flash bang grenades to enter his apartment.[2] We review the district court's denial of summary judgment on qualified immunity grounds *de novo*, asking whether viewing the facts in the light most favorable to the plaintiff, the defendants were nonetheless entitled to qualified immunity as a matter of law. *See Anders*, 521 F.3d at 821 (citing *Sullivan v. Ramirez*, 360 F.3d 692, 696 (7th Cir. 2004)). While a district court's denial of summary of judgment is not ordinarily appealable, when a district court denies sum-

---

[2] The Estate filed a motion for interlocutory certification pursuant to 28 U.S.C. § 1292(b) concerning issues decided in the district court's partial grant of Defendants' Motion for Summary Judgment which was granted by the district court on September 25, 2008. On October 6, 2008, the Estate petitioned this Court for an interlocutory appeal. *See Estate of Escobedo v. Bender, et al.*, Appeal No. 08-8030. On October 23, 2008, this Court denied the Estate's petition for interlocutory appeal. On October 29, 2008, the Estate filed a Motion for Rehearing and Rehearing *En banc*. On November 14, 2008, this Court issued an order instructing the Clerk to distribute the petition *en banc*. On April 21, 2009, this Court denied the Estate's Petition for Rehearing and its Petition for Rehearing *En banc*.

mary judgment on qualified immunity grounds, we have jurisdiction to consider this purely legal question. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1078 (7th Cir. 2005).

We start with the understanding that governmental actors performing discretionary functions enjoy qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Up until the day before this case was argued, *Saucier v. Katz* maintained a sequential procedure for considering whether an officer is entitled to qualified immunity. 533 U.S. 194, 201 (2001). Under *Saucier*, we were required to first determine whether, taking the facts in the light most favorable to the plaintiff, the officers' conduct violated a constitutional right. *Id*. Only if the plaintiff met that burden would we then determine whether the particular constitutional right was "clearly established" at the time of the alleged violation. *Id*. The Supreme Court recently reconsidered *Saucier* and decided "that while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808 (2009). Although it recognized situations in which the *Saucier* approach is beneficial, the Court concluded that the judges of the district courts and the courts of appeals could exercise their discretion in deciding which of the two prongs to address first. *Id*.

Here, the Defendants limit their argument on appeal to the second prong of the *Saucier* qualified immunity

analysis, that is: whether the law was clearly established as of July 19, 2005, that the use of tear gas and flash bang devices in these unique circumstances violates an individual's Fourth Amendment right to be free from the use of excessive force. *See* Appellants' Br. at 19 n. 3 ("Although appellants remain convinced of the propriety of their actions, they acknowledge that the issue for review by this Court on interlocutory appeal is the second prong of the *Saucier* test, whether the law was clearly established at the time of the alleged constitutional violation."). They do not contest the district court's finding that taking the facts in the light most favorable to the Estate, a reasonable jury could find that their decision to use tear gas and flash bang devices against Escobedo, a suicidal, armed, barricaded person, was an excessive use of force under the Fourth Amendment. Accordingly, for purpose of the present appeal, we turn to the second prong of the *Saucier* qualified immunity analysis and assume that a reasonable jury could conclude that the Defendants' conduct violated Escobedo's Fourth Amendment rights.[3]

---

[3] Defendants do make a passing reference in their opening brief to the "objective reasonableness standard," while discussing their decision to enter Escobedo's apartment with the use of tear gas and flash bang devices. *See* Appellants' Br. at 18 ("The objective reasonableness standard does not require that officers use alternative less intrusive means to accomplish their objectives."). The objective reasonableness standard is the constitutional test for use of force considerations. *See Graham v.*

(continued...)

### i. Clearly Established

The Defendants claim that they are entitled to qualified immunity because the law was not clearly established on July 19, 2005, to place them on notice that the use of tear gas and flash bang devices in these particular circumstances was unconstitutional. The Estate has the burden of establishing that the constitutional right at issue was clearly established. *See Boyd v. Owen*, 481 F.3d 520, 526 (7th Cir. 2007); *see also Koger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008) (A plaintiff seeking to defeat an assertion of qualified immunity must establish "that the law concerning the plaintiff's asserted right was clearly established at the time the challenged conduct occurred.") (internal quotations omitted). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"; however, an official action is not protected by qualified immunity

---

[3] (...continued)
*Conner*, 490 U.S. 386 (1989) (holding objective reasonableness standard applicable to Fourth Amendment use of force claims). To the extent that Defendants' language attempts to address the first prong of the *Saucier* qualified immunity analysis, it is in conflict with Defendants' direct statement that it is seeking review only as to the second prong of the *Saucier* test. Furthermore, if it was Defendants' intention to make a substantive argument with passing reference to the objective reasonableness standard, the argument is waived for want of development. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("perfunctory or undeveloped arguments are waived.").

only when the very action in question has previously been held unlawful, rather the unlawfulness must be apparent "in light of the pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

The Estate can demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court. *See Hope*, 536 U.S. at 739-40; *see also Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (identifying two routes for proving that a right is clearly established: (1) the violation is so obvious that a reasonable officer would know that what he is doing violates the Constitution; or (2) a closely analogous case establishes that the conduct is unconstitutional).

### a. Patently Obvious Constitutional Violation

When assessing whether a constitutional violation has occurred, "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances." *See Graham v. Connor*, 490 U.S. 386, 399 (1989). To determine whether the force used to effect a particular seizure is reasonable, we balance the nature and quality of the intrusion on the individual's rights against the "countervailing governmental interests at stake." *See id*. at 395. Factors to consider in making a determination of whether the amount of force used to effectuate a seizure is reasonable include the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight. *See id*. at 397. Other factors include whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. *See McDonald v. Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992). In the end, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." *Id*. at 294; *see also Estate of Starks v. Enyart*, 5 F. 3d 230, 234 (7th Cir. 1993) (finding that the amount of force that is constitutionally permitted to execute a seizure decreases with the threat of danger posed by the individual being seized).

Applying the *Graham* factors, and drawing all inferences in favor of the Estate, the district court could reasonably question whether the Defendant Officers had legitimate reasons to conclude that their use of tear gas and flash bang devices in this situation was acceptable. At the time the officers deployed the first round of tear gas into Escobedo's apartment and continuing on through their decision to deploy a second round of tear gas and then to use more tear gas and flash bang devices to enter to Escobedo's apartment, Escobedo was not posing an immediate threat to the officers or to the public, the standoff was only three hours old, and the officers making the tactical decisions did not have all of the relevant and critical information regarding the negotiations. Escobedo was not resisting arrest, fleeing from the

police or holding hostages. While Escobedo may have posed some level of theat or potential threat to the Defendant Officers because he was armed and under the influence of drugs, taking the facts in the light most favorable to the Estate, he did not threaten to harm anyone but himself. Escobedo had not committed a crime, there were no efforts to arrest him for the commission of a crime, and there were no warrants for his arrest. The officers' own reason for the deployment of the force used was to seize Escobedo for a twenty-four-hour mental health watch. The unreasonableness of the decision is further exacerbated by the breakdown in communication initiated by Defendants, the lack of violent history by Escobedo (confirmed by his counselor), and the lack of any hostages or threats to the public. This scenario coupled with the amount of tear gas utilized by the Defendants, twelve times the incapacitating level of tear gas necessary, the use of flash bang devices within the tear-gas-filled room, and the throwing of the flash bang device into a darkened room with no knowledge of the location of the individual inside that room could possibly create a violation that is so patent that no violator has even attempted to obtain an appellate ruling on it. *See Anderson v. Romero*, 72 F.3d 518, 526-27 (7th Cir. 1995) ("A constitutional violation that is so patent that no violator has even attempted to obtain an appellate ruling on it can be regarded as clearly established even in the absence of precedent.").

The court need not identify this as such a case, however, because on July 19, 2005, Defendants were properly on notice that the use of tear gas and flash bang devices in a closely analogous context was deemed unreasonable.

### b. Closely Analogous Case Law

When looking at closely analogous cases to determine if a right was clearly established at the time of the viola-tion, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit. In the absence of controlling precedent, we must broaden our survey to include all relevant case law in order to determine "whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000).

Finding that a right is clearly established under the second prong of *Saucier*'s qualified immunity analysis is not "predicated upon the existence of a prior case that is directly on point." *Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005) (internal citations omitted). "Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741. Rather, even where there are notable factual distinctions between the precedents relied on and the case before the Court, if the prior deci-sions gave reasonable warning that the conduct at issue violated constitutional rights they can demonstrate clearly established law. *See id*. While Fourth Amend-ment inquiries are fact intensive, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. Accordingly, the salient question here is not whether there is a prior case

identical to the Estate's current claim but whether the state of the law at the relevant time gave the Defendants fair warning that their treatment of Escobedo was unconstitutional. *Green*, 420 F.3d at 701.

### 1.  Tear Gas

This Circuit has previously analyzed under what circumstances the use of tear gas and other disabling chemical agents would be constitutionally impermissible. In *Stringer v. Rowe*, 616 F.2d 993 (7th Cir. 1980) and *Lock v. Jenkins*, 641 F.2d 488 (7th Cir. 1981), we discussed the constitutional limits for the use of tear gas and mace on pre-trial detainee in confined areas. We determined that the use of tear gas against persons confined in a jail cell was appropriate only in rare circumstances and was not justified when a pre-trial detainees did not constitute *an actual threat*. *See Lock*, 641 F.2d at 496 (although a tray could be considered a potential weapon, it was not enough to justify use of tear gas; shouting threats to guards was not enough to justify the use of tear gas; engaging in a riot after attempting to escape and taking the prison warden and others hostage was enough to justify use of tear gas). In so holding, we looked to several other circuits that had previously ruled that "the use of such agents should be strictly limited to circumstances presenting the utmost degree of danger and loss of control," and that the "use of potentially dangerous quantities of the substance is justified only under narrowly defined circumstances." *Stringer*, 616 F.2d at 999 (citing *Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979) and *McCargo v.*

*Mister*, 462 F.Supp. 813, 819 (D. Md. 1978)). Additionally, we specifically stated that the use of tear gas "to subdue individual prisoners, rather than to quell large disturbances, should be more restricted." *Id*.

Other circuits have also addressed the constitutional limits of using tear gas on non-prisoners. *See Jacobs*, 215 F.3d at 766. In *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003),[4] the police received a complaint which caused them to go to the Smith's house. *Id*. at 502. Smith was a former Vietnam veteran and suffered from various mental health problems including Post-Traumatic Stress Disorder. *Id*. at 501-02. After arriving at Smith's home and receiving no response from knocking on the door, the officers saw a red light and believed that it was a laser-sighted firearm that Smith was pointing at them. *Id*. After attempting to communicate with Smith, the officers called for an ERT team. *Id*. The ERT team arrived with thirty officers and numerous weapons. *Id*. at 503. During the course of negotiations with Smith, the ERT team refused to let friends or family communicate with Smith and rejected the use of a psychologist. *Id*. The ERT team

---

[4] Defendants argue that *Marasco* was decided in November 2005, which is after the date of the incident in this case and therefore *Marasco* could not have placed the Defendants on notice that their conduct was unlawful; however, the Third Circuit has two opinions concerning *Marasco*. *Compare Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) (*Marasco* I), *with Estate of Smith v. Marasco*, 430 F.3d 140 (3d Cir. 2005) (*Marasco* II). *Marasco* I is discussed in this Opinion and was decided prior to July 2005.

then decided to clear Smith out of his house, and to enter his house themselves with the use of tear gas and flash bang grenades. *Id*. The *Marasco* court held that Smith had proffered sufficient facts to make the question of whether the defendant officers used excessive force in deploying tear gas and flash bang grenades appropriate for resolution by a jury. *Id*. at 516. In making this determination, the court stated that the ERT were approaching only one man, not a large group and there were no hostages inside the house. *Id*. Although officers were aware that Smith was mentally unstable and was possibly possessing a firearm, there was no indication that Smith had been using a gun recently or that Smith had ever used a gun in a violent manner. *Id*. at 517. The officers were not attempting to make an arrest at the time they decided to use the tear gas and flash bang grenades, and there was no indication in the record that Smith had any history of violence which the officers would have been aware of. *Id*. Lastly, the court held that a jury should be allowed to hear the testimony of Smith's police expert who was of the opinion that the officers behavior was unreasonable and unlawful. *Id*.

In the absence of controlling precedent from our circuit, courts look to other circuits to ascertain whether there was such a clear trend in the case law that the recognition of the right by a controlling precedent was merely a matter of time. *See Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989). There are other decisions from our sister circuits that are "closely analogous" to the situation before us so as to put the Defendant Officers on notice that their decision to use tear gas against

Escobedo was an unreasonable use of force *See, e.g., Vinyard v. Wilson*, 311 F.3d 1340, 1349 (11th Cir. 2002) (officer used excessive force under *Graham* where he pepper sprayed a handcuffed and confined detainee); *Green v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002) (officers conduct might be found to be excessive force where officer used pepper spray on individual who was arrested for non-severe crime and who was not threatening anyone's safety or attempting to evade arrest by flight even though individual may have been actively resisting arrest and refused to be handcuffed); *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (prison guard's use of tear gas "unquestion-ably crossed the line separating necessary force from brutality" where prisoner was locked in his cell and posed no direct physical threat to other inmates or any of the guards); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) (a reasonable officer would know that spraying mace on a potentially blinded, incapacitated individual would violate the right to be free from excessive force).

Based on controlling precedent from this Circuit and the clear trend in the law from our sister circuits, the clearly established law as of July 19, 2005, established that the use of tear gas is unreasonable when: (1) attempting to subdue individuals as opposed to mass crowds; (2) when the individual does not pose an actual threat; (3) when the individual is not holding hostages; (4) when the individual has not committed a crime and the officers are not in the process of attempting to make an arrest; (5) when the individual is armed but merely suicidal as opposed to homicidal; (6) when the individual is not attempting to evade arrest or flee from the police; and

(7) when the individual is incapacitated in some form. Here, like Smith in *Marasco*, Escobedo was alone in his apartment, he was not inciting a riot, making a "large disturbance," holding hostages or making any threats. *See Lock*, 641 F.2d at 496. Like Smith, Escobedo had mental health issues and a gun, but there was no indication that Escobedo had been using a gun recently or that Escobedo had ever used a gun in a violent manner. Unlike Smith, however, who allegedly pointed his gun at the police but where the court still found that the officers' conduct in deploying tear gas and flash bang devices could be found to be unreasonable, Escobedo did not point his gun at anyone but himself. When the officers made their decision to enter the apartment, there was no one else at risk in the apartment and the reasons given by the officers for entering the apartment at that time were solely traffic concerns and the depleted energy of the officers on the scene; they were not based on any concern that Escobedo was an imminent threat to others. By the time the Defendants entered Escobedo's apartment they had already fired twelve times the incapacitating amount of tear gas into his home. The amount of gas emanating from Escobedo's apartment was so strong that Officer Ebetino had to leave his station outside Escobedo's apartment because he did not have a gas mask. Therefore, taking the facts in the light most favorable to the Estate, Defendant Officers would have known that Escobedo was incapacitated inside the apartment and decided to use more tear gas and flash bang grenades subsequent to the initial gas. The similarity of the facts on the *Marasco* case and of Escobedo's situation

placed the Officers on notice that their entry was possibly unconstitutional. *See Hope*, 536 U.S. at 739.

The Defendants assert that these cases are insufficient to put them on notice because they do not specifically address the use of tear gas where the objective was to force an armed and suicidal person from a dwelling. The *Marasco* case, however, is strikingly similar and exact similarity is not required. *See Hope*, 536 U.S. at 739 (An official action is not protected by qualified immunity only when the very action in question has previously been held unlawful, rather the unlawfulness must be apparent "in light of the pre-existing law."); *Chaklos v. Stevens*, 560 F.3d 705, 716 (7th Cir. 2009) ("The question is not whether there is a prior case 'on all fours' with the current claim."); *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (for a right to be clearly established there does not have to be a prior case with materially similar facts; officials may still be on notice in "novel factual circumstances."). Based on the facts as presented to us in the record and taking them in the light most favorable to the Estate, we find that Defendants' actions in deploying an excess amount of tear gas to extricate Escobedo, a non-threatening, non-violent, non-resisting individual, from his apartment violated a clearly established right and therefore the Defendants are not protected by qualified immunity.

### 2. Flash Bang Grenades

The Defendant Officers contend that they are entitled to qualified immunity for their decision to use flash bang

devices to enter Escobedo's arpartment. We have previously indicated that the use of flash bang devices should be limited and is not appropriate in most cases. In *Molina v. Cooper*, 325 F.3d 963 (7th Cir. 2003), while we found that the officers' use of flash bang devices during the execution of a "high risk" search warrant—which was obtained for Molina's home on suspicion of drug activity—was reasonable because Molina had a criminal history that included aggravated assault, was alleged to be the head of a drug distribution organization, was associated with gangs, was home and had access to a stash of weapons, we expressly stated that "we in no way suggest that the use of flash bang devices is appropriate in every case (or even most cases)." *Id*. at 966 n. 1, 973. In finding that the officers' deployment of flash bang devices was reasonable, we emphasized that the officers had a significant reason to be concerned about their personal safety and we expressly limited our holding to the circumstances presented in that case. *See id*. at 973. In *United States v. Folks*, 236 F.3d 384 (7th Cir. 2001), we discussed, in dicta, the potentially serious injuries that may arise from the use of a flash bang device during a search. We suggested that a sufficiently careful (or perhaps reasonable) use of a flash bang device occurs when officers take a moment to look inside a residence or a room to ensure that no one would be injured by the device before tossing it and where officers carry a fire extinguisher to quickly extinguish any fires resulting from deployment of the device. *Id*. at 388 n.2. We also, in no uncertain terms, pointed out that the use of a flash bang device is justified when "potentially *violent* people [can] be

found in [a] house," as opposed to individuals who pose no threat to the police or others. *Id*. at 388 n. 2 (emphasis added). We noted that if the government does not use discretion in when and how they use flash bang devices, they "may [ ] risk significant damage claims from the careless deployment of flash-bang devices." *Id*. In *United States v. Morris*, 349 F.3d 1009 (7th Cir. 2003), we explicitly stated that this Court has "often emphasized the dangerous nature of flash-bang devices and has cautioned that the use of such devices *in close proximity to suspects may not be reasonable*." *Id*. at 1012. (Emphasis added). We suggested, also in dicta, that the use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher. *See id*. at 1012 n. 1.

We also discussed the appropriateness of using flash bang devices in *United States v. Jones*, 214 F.3d 836, 837-38 (7th Cir. 2000). In *Jones*, we were disturbed by the officers use of flash bang devices and stated that while the district court found their conduct to be reasonable, we were less certain. *Id*. Specifically, we unambiguously stated that "police cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash-bang device'," particularly where they do not believe the drug dealer is an unusually dangerous individual. *Id*. We found this to be true even though guns are normally used in the drug trade and even

where a drug dealer has a prior weapons offense. *Id.* Lastly, while *Jones* was a criminal case that discussed the use of flash bangs in the context of suppressing evidence, we specifically stated that "[i]f this were a damages action seeking compensation for injury to the occupants or to the door, the claim would be a serious one." *Id.*

Other circuits have similarly considered the constitutional limits of using a flash bang device. *See, e.g., Boyd v. Benton County*, 374 F.3d 773, 777-79 (9th Cir. 2004) (use of flash bang device unconstitutional use of excessive force where police deployed it without either looking or sounding a warning when there were innocent individuals in a room as well as suspected robbers). Additionally, the court in *Estate of Smith v. Marasco*, 318 F.3d 497, 515-18 (3d Cir. 2003), previously mentioned above, discussed the use of flash bang grenades to enter an individual's home where the purpose was not to arrest him and where the individual was non-threatening, mentally unstable and suicidal. The *Marasco* court determined that a reasonable jury could find that the defendant officers' conduct was unreasonable and excessive under the Fourth Amendment. *Id.*

Here, the Defendants first deployed a flash bang grenade as the ERT team made its entry into Escobedo's apartment. The record reflects that the Defendant Officers had no idea where Escobedo was located when they threw the first flash bang into his apartment. Additionally, there is no evidence that the officers visually inspected the area before throwing the flash bang device

or that they looked inside, even ever so slightly, to see if anyone else was present that may be injured by the flash bang. The second flash bang device was deployed when the Defendants entered Escobedo's bedroom. The Defendants were only able to force the door open slightly and the room was "pitch black" when they threw the flash bang grenade. The flash bang device landed next to Escobedo's head when it exploded. The record reflects that Escobedo was blind and deaf when the officers entered his bedroom as a result of the location of the explosion in proximity to his head. Additionally, the Estate's police expert testified that a flash bang grenade should be placed in a room, not thrown or tossed, so as to prevent it from landing in an unintended location.

There is no evidence that the Defendant Officers were carrying a fire extinguisher even though they had previously deployed tear gas accelerants into Escobedo's apartment and, in fact, the initial flash bang device set a fire in Escobedo's apartment because it hit a tear gas canister. Furthermore, as stated previously, drawing all inferences in favor of the Estate, Escobedo was not considered to be a violent, dangerous individual, he was not the subject of an arrest and he did not pose an immediate threat to the police or others. The fact that Escobedo was in possession of a gun does not provide support for the Defendants that their use of flash bang devices was reasonable. *See Jones*, 214 F.3d at 837-38.

On these facts, viewed in the light most favorable to the Estate, the law points only in one direction: the use of the

flash bang devices in this case was an unreasonable use of force to which qualified immunity does not apply. As discussed above, through the use of "lucid and unambiguous" dicta, *see Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009), we have repeatedly expressed our concern with the overuse of flash bang devices, especially where the circumstances do not warrant such extreme measures. This is because flash bang devices are essentially grenades and can be very dangerous and destructive. Despite the absence of a great deal of precedent in this area, the pertinent holdings and dicta do show a clear trend in the law that addresses the egregious circumstances of this case; even if the contours of the constitutional implications of the use of "flash bang" devices in general is not clear, it is abundantly clear that this case arises in precisely the circumstances that this Court and other circuits have sought to avoid by providing detailed guidance on when the use of flash bang devices is (and is not) appropriate under the Constitution. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (even dicta may clearly establish a right); *see also Hanes*, 578 F.3d at 496. If this were a borderline case, perhaps the relative paucity of judicial holdings forbidding the use of flash bang devices as compared to other more fully developed areas of Fourth Amendment jurisprudence would counsel in favor of a generous application of qualified immunity. However, on the facts of this case, the officers' conduct in the use of the flash bang devices so clearly exceeded the bounds of reasonableness in the circumstances that it cannot be said to lie near the "hazy border between excessive and acceptable force" along which qualified

immunity shields officers from liability for their snap judgments, if those judgments prove to be wrong upon further reflection.

Based on the pre-existing case law, it was clearly established as of July 19, 2005, that throwing a flash bang device blindly into an apartment where there are accelerants, without a fire extinguisher, and where the individual attempting to be seized is not an unusually dangerous individual, is not the subject of an arrest, and has not threatened to harm anyone but himself, is an unreasonable use of force. Therefore, taking the facts as presented to us from the district court, the Defendants are not entitled to qualified immunity and the issue of the officers' decisions must be presented to a jury.

### III.  Conclusion

The district court did not err in denying Defendants' Motion for Summary Judgment based on qualified immunity. Accordingly, we AFFIRM the decision of the district court.

MANION, *Circuit Judge*, concurring in the judgment in part and dissenting in part.  What started out as a seemingly routine response to Rudy Escobedo's 911 call threatening his own suicide descended into an unfortunate and certainly disturbing result. In hindsight, at least, the response to his threat likely should not have gone much beyond the telephone negotiations initiated by Sergeant Taylor and continued by Officer Ebetino.  However, communications eventually broke down and what appears to have been an unnecessary assault with the tear gas and flash-bang devices[1] ensued.

Although I question whether the cases cited by the court clearly established that the officers' use of tear gas violated the Fourth Amendment, I do believe that reasonable officials would have known that using twelve times the incapacitating quantity of tear gas to extricate a person at home alone who had only threatened to harm himself and was not suspected of committing a crime "was unconstitutional without guidance from courts." *Gossmeyer v. McDonald*, 128 F.3d 481, 496 (7th Cir. 1997). For that reason, I concur with the court's conclusion that the defendants' use of tear gas was not protected by qualified immunity.

I disagree, however, with the court's conclusion that the defendants are not entitled to qualified immunity for

---

[1] Commonly used by law enforcement, flash-bang devices are non-lethal distraction tools that "generate a loud explosion and a brilliant flash that disorient suspects." *See* "police::explosives," http://www.search.eb.com/eb/article-260942 (last visited January 29, 2010).

their use of the flash-bang devices. The majority opinion holds that on the date of the incident it was clearly established that the defendants' employment of the flash-bang devices was an excessive use of force. In reaching its conclusion, the court relies upon six cases that involved the use of such devices by law enforcement. But as explained below, those cases neither separately nor collectively clearly established that the defendants' conduct was unconstitutional. And because the defendants' use of the flash-bang devices—unlike their use of the tear gas—was not obviously in violation of the decedent's constitutional rights, they are entitled to qualified immunity on this issue.

The first of the four cases from this circuit cited in the majority opinion is *Molina v. Cooper*, 325 F.3d 963 (7th Cir. 2003)—an excessive force case. There, while executing a search warrant, police used flash-bang devices in entering a basement because they believed a suspect with a criminal record that included an aggravated assault was at home and had access to weapons. *Id.* at 973. The officers believed that no one other than Molina was in the house and "had ample reason to be concerned about their personal safety." *Id.* Although we were careful to not suggest "that the use of flash bang devices is appropriate in every case (or even most cases)," we held that the use of the devices "was reasonable under the circumstances" and did not constitute excessive force. *Id.*

*Molina* is the most relevant case for the issue confronting us because it is from this circuit, it is an excessive force case involving flash-bang devices, and the discussion of the propriety of using such devices was not

dicta. Unfortunately, the court substantially discounts the case by saying that *Molina* "expressly limited [its] holding to the circumstances presented." *Ante*, at 27. But nearly all excessive force cases are fact-specific and context-dependent, *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003), and that does not limit the relevance of such cases in qualified immunity analyses. *Molina* speaks for itself: where police are executing a search warrant and believe that a person with a record of aggravated assault is at home alone with access to weapons, the use of flash-bang devices is appropriate. 325 F.3d at 973. Here, as in *Molina*, no one else was present in the dwelling where the police used flash-bang devices to incapacitate a person who possessed a weapon. But this case is not on all fours with *Molina*, mainly because Escobedo had no history of aggravated assault and the defendants were not executing a search warrant. Nevertheless, *Molina*'s relevance to the qualified immunity analysis here is significant and should be recognized as the leading authority in this circuit.

The court should not simply confine *Molina* to its facts and then derive "detailed guidance" from what it calls "'lucid and unambiguous' dicta" in three evidence suppression cases from this circuit. *Ante*, at 31. In those three cases, the statements that were critical of the police's use of flash-bang devices were dicta—as the majority opinion rightly recognizes. Although we have stated that in limited circumstances dicta can clearly establish the existence of a constitutional right, the dicta must be "lucid and unambiguous," as when a court observes that certain conduct violates a constitutional right but ultimately holds that the right was not clearly

established. *Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009). The dicta in those three cases does not come close to meeting that high standard: in none of them did we conclude that the use of flash-bang devices constituted excessive force.

In *United States v. Jones*, 214 F.3d 836 (7th Cir. 2000), the defendant appealed the denial of his motion to suppress evidence that was obtained by police during a no-knock entry into his dwelling using a battering ram and a flash-bang device. We chastised the police's use of the flash-bang device because (unlike here) an innocent adult and child were inside the apartment. *Id.* at 838. The district court had held that the officers' conduct was reasonable in all respects; we said we were "less certain," although we did not say that the district court was wrong. *Id.* at 837. We also stated that "police cannot *automatically*" employ flash-bang devices just because they are entering the house of a drug dealer. *Id.* (emphasis added). That proposition is unremarkable and in fact implies that such devices are appropriate in some situations. In addition, we noted that were the action one for personal injury it "would be a serious one"; but *Jones* was not a personal injury action, "so whether one would succeed is not something we need[ed to] decide." *Id.* at 838.

In *United States v. Folks*, 236 F.3d 384 (7th Cir. 2001), a suppression case similar to *Jones,* the defendant appealed the denial of his motion to suppress evidence from a dwelling search where the police used a flash-bang device in an unlit residence at night. After quickly looking inside, the officers deployed the device, and when they entered they encountered an armed man and the defen-

dant. *Id.* at 387. The court determined that the evidence was admissible under the inevitable discovery doctrine but acknowledged the serious damage flash-bang devices can cause, observing that "[t]he government may thus risk significant claims from the careless deployment of flash-bang devices." *Id.* at 388. But focusing on the specific facts of the case, the court concluded that the police's use of a flash-bang device *was* sufficiently careful because the officers had looked into the residence before tossing the devices and had carried a fire extinguisher to put out any resulting fires. *Id.* at n.2. The use of the device was justified, we thought, because the police's suspicions that potentially violent people might be at home were confirmed. *Id.* We did not suggest, however, that not using the same cautious measures would necessarily be an excessive use of force. Yet here, the court lists the sufficient precautionary actions the police took in *Folks* and treats them as if they are *necessary* measures for the proper use of flash-bang devices.[2] *Ante*, at 27, 29-30.

And in *United States v. Morris*, 349 F.3d 1009 (7th Cir. 2003), the defendant attempted to suppress weapons

---

[2] The court also suggests that *Folks* is unlike this case because there were potentially violent people present there. *Ante*, at 27-28, 30. In doing so, the court appears to define violent persons as only those who pose a threat to police or others. A person who is high on cocaine, has a gun, and is threatening to kill himself is certainly a potentially violent individual. Police cannot be expected to assume that when they encounter such a person, he poses no threat of violence to them merely because he has not previously expressly threatened them or others.

found during a search of his residence and his incul-
patory statements because the police had unreasonably
used flash-bang devices to facilitate the search. In *Morris*,
we cited *Jones* and *Folks* for the manifest proposition
that flash-bang devices are dangerous. *Id.* at 1012. But we
also stated that the police's use of the devices in that
case appeared to be *reasonable* because of the dangerous
individuals involved, the dangerous entry point for
police, and the precautionary measures the officers took:
asking whether children were present, inspecting the
area where the devices were to be employed, and carrying
a fire extinguisher. *Id.* at 1013 n.1. We did not suggest,
however, that the use of flash-bang devices under dif-
ferent and possibly less dangerous circumstances and
with fewer precautions taken by police would necessarily
be unreasonable. Still, the court treats police measures
that were sufficient to approve employment of the flash-
bang devices in *Morris* as required measures here when it
reads *Morris* as suggesting that "the use of a flash bang
grenade is reasonable *only* when there is a dangerous
suspect and a dangerous entry point for the police, when
the police have checked to see if innocent individuals are
around before deploying the device, when the police have
visually inspected the area where the device will be
used and when the police carry a fire extinguisher."[3] *Ante*,
at 28 (emphasis added).

---

[3] The court does not mention the similarities between this case
and *Morris*: as discussed below, the officers were faced with
a dangerous entry point and believed they could be encoun-
tering a dangerous person.

The court also cites two cases from outside this circuit. In *Estate of Smith v. Marasco*, 318 F.3d 497, 517 (3d Cir. 2003) (*Marasco I*), the Third Circuit concluded that the district court erred in granting summary judgment for the officers on the plaintiffs' excessive force claim because the plaintiffs had "proffered evidence sufficient to require that the question of the reasonableness of the [officers'] tactics be submitted to a jury." *Marasco I* was not a qualified immunity case, and the court merely held that a jury question existed on whether the facts established excessive force. *Id.* at 518. Indeed, it "recognize[d] that a jury could conclude" that the force used "was a reasonable response to the threat the officers perceived." *Id.* at 517. *Marasco I* thus provides little (if any) guidance here: a holding that a particular employment of flash-bang devices *could* (or could not) be an excessive use of force does not clearly establish anything.

The only case cited by the court that actually held that a particular use of flash-bang devices was an excessive application of force is *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004). There, the Ninth Circuit concluded that throwing a flash-bang device blindly into a room occupied by up to eight innocent bystanders and criminal suspects was unconstitutionally excessive force. *Id.* at 779. Hence, in the Ninth Circuit it appears to be clearly established that when pursuing armed suspects, the police cannot blindly toss a flash-bang device into a room occupied by up to eight people who were unconnected to the crime under investigation. Here, however, in sharp and material contrast to *Boyd*, there were no innocent bystanders present but only an armed, suicidal

individual who was high on cocaine. And the defendants' failure to look into Escobedo's bedroom before they deployed the flash-bang device is not surprising: he had barricaded the door. Moreover, in this circuit *Molina* demonstrates that it is not unreasonable for police to use flash-bang devices when they believe that the only occupant in a dwelling is armed and thus they have "ample reason to be concerned about their personal safety." 325 F.3d at 973. *Molina*—not *Boyd*—is the controlling precedent, and it supplied a sound basis for the defendants' use of the flash-bang devices. Perhaps the only thing clear here is that the cases the court relies upon did not give the defendants notice and it was not clearly established that their conduct was unlawful. In my view, and in the words of the Supreme Court,

> [t]hese . . . cases taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case. None of them squarely governs the case here; they do suggest that [the officers'] actions fell in the "hazy border between excessive and acceptable force." The cases by no means "clearly establish" that [their] conduct violated the Fourth Amendment.

*Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam) (citation omitted).

This case is obviously not over. The question remains whether it was reasonable for the police to go to this extent in effect to rescue a man who was threatening suicide. I assume the building had been cleared of other occupants (given the extensive tear gas use, anyone

remaining would have likely exited on their own accord). Once communications broke down and the SWAT team arrived, the officers in charge thought it was necessary to employ these extreme resources when the only apparent threat was that of Escobedo to himself. Once the place was saturated with tear gas and the four officers were ordered to enter the apartment, a new scenario involving the use of flash-bang devices emerged. In order to determine what is reasonable under these circumstances, the conditions that existed when the four officers reached the apartment door have to be isolated and separated from the original decision to deploy the SWAT team and to use what was obviously an excessive amount of tear gas. In other words, regardless of whether the initial assault and tear gas saturation was reasonable, at this point the four officers were ordered to force their way in. When they reached the door of the apartment, they were wearing gas masks because of the tear gas saturation. Unfortunately, this necessity limited their vision and their hearing. They knew Escobedo was high on drugs, was in possession of a gun, and had refused to come out. Clearly this presented a dangerous entry point for the officers, which may have justified employment of the flash-bang devices. When they reached the bedroom door that was substantially blocked, other than to retreat, the flash-bang devices may have been their safest option.

In conclusion, the law at the time of the incident did not clearly establish that the defendants' employment of flash-bang devices was an unconstitutional application of force, nor was their use of such devices patently

violative of Escobedo's Fourth Amendment rights. There-fore, I would reverse the district court's contrary decision and conclude that the defendants are entitled to quali-fied immunity for their employment of the flash-bang devices.