In the

# United States Court of Appeals
### For the Seventh Circuit

No. 12-1121

CINDY C. ABBOTT and
TRAVIS ABBOTT,

*Plaintiffs-Appellants*,

*v.*

SANGAMON COUNTY, ILLINOIS,
NEIL WILLIAMSON, Sheriff,
Sangamon County, Illinois, and
TROY M. SWEENEY, Deputy Sheriff,
Sangamon County, Illinois,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:09-cv-03261-SEM-BGC—**Sue E. Myerscough**, *Judge*.

ARGUED SEPTEMBER 25, 2012—DECIDED JANUARY 29, 2013

Before KANNE, TINDER, and HAMILTON, *Circuit Judges*.

TINDER, *Circuit Judge*. Cindy Abbott and her adult son
Travis Abbott (collectively, the Abbotts) brought this
action under 42 U.S.C. § 1983 against Sangamon County,

Sheriff Neil Williamson, and Deputy Troy Sweeney, each asserting Fourth Amendment claims of false arrest, false imprisonment, and excessive force. The district court granted summary judgment for Deputy Sweeney on all claims, and the County and Sheriff Williamson were subsequently dismissed. We affirm the district court's judgment with respect to all of Travis's claims because Deputy Sweeney had probable cause to arrest Travis and is entitled to qualified immunity on Travis's excessive-force claim. We also affirm the district court's judgment with respect to Cindy's false-arrest and false-imprisonment claims on the basis of qualified immunity. But we vacate the judgment with respect to Cindy's excessive-force claim and remand for further proceedings.

## I

### A

Given the procedural posture of this case, we view the facts in a light favorable to the Abbotts, the nonmovants. *E.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 740 (7th Cir. 2011). But we also point out several of the material differences between the Abbotts' version of events and Deputy Sweeney's narrative.

On the morning of June 25, 2007, Sangamon County animal control officers responded to a complaint that the Abbotts' dog, a Chow mix named Biscuit, had been running loose on Lyons Road in Spaulding, Illinois. After visiting the complainants' residence, Animal Control Officer John Moore went to the Abbotts' residence and

observed twenty-year-old Travis Abbott running into the house and Biscuit unchained in the garage area. (The record indicates that up to two additional animal control officers were present, but it is unclear whether they arrived with Officer Moore.)

Over the next hour-and-a-half Officer Moore attempted to corral Biscuit, but Travis interfered with those efforts by running to different doors and windows in the house and calling out Biscuit's name, which prompted Biscuit to run to that area of the house. At one point, Travis told Moore and another animal control officer that if they touched his dog he would "knock them out." Travis shouted additional threats at Officer Moore while displaying his middle finger, at one point yelling, "If you don't leave I'm going to kick your ass." These repeated threats prompted Officer Moore to call the police. When informed that the police had been called, Travis locked himself inside but continued calling Biscuit to different areas of the house. At some point, Travis called his mother, Cindy Abbott, who was at work, and asked her to come home.

Sergeant James Lawley of the Riverton Police Department was the first police officer to arrive at the Abbotts' residence, but he was instructed to standby until a Sangamon County Deputy arrived. The animal control officers informed Sergeant Lawley that Travis had obstructed their efforts to capture Biscuit and had threatened them by shouting, "If you touch my dog I am going to kick your ass[;] I am going to knock you out." Sergeant Lawley successfully summoned Travis to

the house's front window and then asked him to step outside and talk; Travis responded, "Fuck you. I am no[t] coming out there." A few minutes later, Deputy Sweeney arrived and was told by Sergeant Lawley that Travis had threatened the animal control officers while making a fist; Sweeney attempted to coax Travis out of the house but was unsuccessful. Around this time, Cindy arrived home and parked her Jeep Liberty in the driveway behind Sweeney's squad car. Deputy Sweeney talked with Cindy and requested that she convince Travis to come outside and tell his side of the story; Sweeney advised Cindy that he could get a warrant if Travis refused. Cindy went inside the house and came back outside a short time later with Travis in tow.

Upon questioning by Deputy Sweeney, Travis admitted that he had verbally threatened the animal control officers, knowing them to be animal control officers. Sweeney informed Travis that he was under arrest for obstruction and assault. Travis protested and began backing away, but Sergeant Lawley grabbed his arm and advised him not to resist. Sweeney handcuffed Travis's arms behind his back, double locked the handcuffs, and confirmed the proper fit. Once handcuffed, Travis became agitated and angry with Cindy, yelling and cursing at her. And as he was being escorted to Sweeney's police cruiser, Travis yelled to the animal control officers, "Thanks a lot assholes!" Sweeney conducted a quick pat-down search and then placed Travis in the backseat of his squad car, fastening him in with a seatbelt.

Once Travis had been handcuffed, Cindy had gone back into the house to use the restroom and to lock up. When she came back outside, she stood in the driveway and talked with Sergeant Lawley. At this point, Deputy Sweeney had begun backing his squad car out of the driveway, which required him to maneuver around Cindy's vehicle.

Meanwhile, Travis had become even more agitated in the backseat of the squad car. He had elevated his legs, struggled around, and successfully maneuvered his hands from behind his back to the front of his body; he had also begun screaming for his mother to get him out. (According to Sweeney, Travis had also unfastened his seatbelt and was reaching for the door, but Travis denies this.) Sweeney's squad car that day was not equipped with a partition or a prisoner-transport shield, so when Sweeney saw Travis fidgeting around he reached back and attempted to gain control of Travis, all the while still trying to navigate his car backward around Cindy's vehicle. Perhaps unsurprisingly, Sweeney's foot slipped off the brake pedal as he was trying to control Travis and his cruiser rolled into Cindy's vehicle.

Cindy, who was still speaking with Sergeant Lawley, began screaming when the vehicles collided. Lawley attempted to calm her, telling her that Sweeney had merely bumped her vehicle and that any damage would be covered by insurance. Cindy did not calm down. Instead, she began walking toward her vehicle and the squad car to inspect the damage and was screaming, "I can't believe you hit my vehicle!"

Deputy Sweeney placed his cruiser in park and exited so that he could go to the rear passenger-side door where, according to him, Travis was attempting to escape. But as he exited the vehicle, he observed Cindy, upset and screaming, moving toward his location at the front driver-side door of the squad car. According to Sweeney, he was concerned that Cindy was trying to help her son escape, for Travis was still "going nuts" in the backseat of the car. As a result, he held up his hand and twice ordered Cindy to stop, but she continued on toward the vehicles. Cindy does not recall whether Sweeney ordered her to stop, though she does recall that he attempted to calm her. According to Cindy, she was walking toward her vehicle to inspect the damage when Deputy Sweeney, without warning, shot her in the abdomen with his taser, causing her to fall to the ground. Specifically, she explained that "something hit me and it dropped me to my knees and then on my back and I was immobilized." As she was screaming from the pain, Deputy Sweeney came closer to her and yelled for her to roll over onto her stomach, but she could not move so Sweeney hit her with another jolt of electricity. After the second jolt, Sweeney rolled Cindy over onto her stomach and handcuffed her with her arms behind her back. With Cindy secure, Sweeney then went to the other side of the squad car to resecure Travis.

Sweeney disputes Cindy's version. According to Sweeney and Sergeant Lawley, Cindy was screaming about her son being arrested and her car being hit. When Cindy disobeyed Sweeney's orders to stop, he warned her twice that if she failed to comply he would use his

taser. And when she continued approaching, he shot her in the abdomen with his taser, delivered an electric shock, and caused her to drop to the ground. Sergeant Lawley claims that after the first tasing, Cindy disobeyed Sweeney's order to turn over and attempted to get up, so Sweeney zapped her a second time. Sweeney, however, testified that he "began giving her commands to turn over onto her stomach so that she could be handcuffed," but she was not responsive so he "again commanded her and told her if she did not comply that she would be tased again"; Cindy again gave no response, so Sweeney tased her a second time. After the second tasing, Cindy rolled over onto her stomach without help and placed her hands behind her back. Sergeant Lawley placed her in handcuffs, while Sweeney went to deal with Travis.

Travis testified that when Sweeney arrived at the rear passenger-side door, he "got on top of me and dropped an elbow on my throat and just tried to ta[s]e me. The top was off of it, the ta[s]er . . . . And he tried to getting [sic] me all over my whole body. And he did, he kept getting me, getting me, getting me. I was trying to fight with him." He testified further that Sweeney told him "just let me get you one good time" and Sweeney started "getting" him all over his arm with the taser, delivering "little second bursts." Travis also claims that once Sweeney pulled him out of the car he threw him on the ground, gave him "the knee bomb," and used the taser three more times on his back. Travis denies that he was attempting to escape and that he was acting wild when Sweeney opened the rear pas-

senger-side door. But he does not dispute that he was struggling with Sweeney in the back of the police cruiser and at one point was "out powering" Sweeney.

Deputy Sweeney's recollection is significantly different. According to him, while he was engaged with Cindy, Travis was kicking the rear passenger-side-door window in an attempt to escape (he could not simply open the door because the child-safety switch was on, so he was trying to kick his way out). And according to Officer Moore, when Sweeney opened the car door Travis "continued to act wild and attempt to escape and fight with Deputy Sweeney." Sergeant Lawley went to assist Sweeney after he had secured Cindy, and when he arrived at the rear passenger-side door, Sweeney was on top of Travis, but Travis had his hands in front of him and was fighting. Sweeney told Travis to stop resisting but to no avail; ultimately he had to use his taser to subdue Travis. Officer Moore stated that Sweeney "drive stunned" Travis "until he stopped fighting." According to Deputy Sweeney, he used his taser on Travis only inside the car. Once Travis was subdued, Deputy Sweeney and Sergeant Lawley removed Travis from the backseat and placed him on the ground in a prone position. Sweeney then unlocked the handcuffs and reapplied them with Travis's hands behind his back. Travis complied with Sweeney's order to remain lying face down.

Cindy could hear Travis screaming but she could not see him; in fact, she did not see Travis from the time he was first handcuffed until later at the police station.

After Cindy had been lying on her stomach with her hands cuffed behind her back for what she thinks was thirty minutes, Deputy Sweeney returned and sat her up. Sweeney then had a female animal control officer remove the taser prongs from Cindy's abdomen. He then told Cindy that he would summon another officer to transport her.

Eventually, Cindy and Travis were transported to the police station in separate vehicles. They were held at the jail for about eight hours until Cindy's parents (Travis's grandparents) posted bail. Cindy was never informed of the charges against her. She hired an attorney to represent her and Travis at their court date, but she never heard anything further and assumed that the matter had been dropped.

**B**

In 2009, the Abbotts filed this action under 42 U.S.C. § 1983 in Illinois state court, but the defendants removed the case to the Central District of Illinois, *see* 28 U.S.C. § 1441. On August 19, 2011, the Abbotts filed their second amended complaint, in which they each asserted claims of false arrest, false imprisonment, and excessive force.

The district court granted Sweeney's motion for summary judgment. *See Abbott v. Sangamon County*, No. 09-3261, 2011 WL 5244259 (C.D. Ill. Nov. 3, 2011). The court concluded that Deputy Sweeney had probable cause to arrest both Travis and Cindy and that, in any

event, he was cloaked with qualified immunity. *Id.* at *5-6, 10. On Travis's excessive-force claim, the court concluded that Sweeney was "entitled to qualified immunity because a reasonable officer could have believed that he was entitled to use force on an arrestee who continued to physically resist or who failed to submit to the officer's authority." *Id.* at *9 (citation omitted). And "based on the undisputed fact that Deputy Sweeney used the taser until Travis stopped fighting, Deputy Sweeney's use of force was no more than that necessary to gain control of Travis." *Id.* (citation omitted). On Cindy's excessive-force claim, the district court concluded that Cindy had admitted that she disobeyed direct orders to stop and roll over on her stomach, so "[a] reasonable officer would have believed that employing a taser gun [the first time] . . . would not violate Cindy's constitutional rights." *Id.* (citation omitted). As to the second employment of the taser, the court dismissed Cindy's testimony that she did not comply because she could not move because "'what matters for this question is not the arrestee's perspective but rather the perspective of a reasonable officer on the scene.'" *Id.* at *10 (citation omitted).

Subsequently, the Abbotts filed a motion to dismiss the remaining defendants as well as a motion to alter the judgment. On January 5, 2012, the district court dis-

missed the remaining defendants without prejudice,[1] denied the motion to alter the judgment, and entered final judgment against the Abbotts. This appeal followed.

## II

We review de novo the district court's grant of summary judgment. *E.g.*, *Suarez v. Town of Ogden Dunes, Ind.*, 581 F.3d 591, 595 (7th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *accord Messerschmidt v. Millender*, 132 S. Ct. 1235,

---

[1] During oral argument before this court, the Abbotts' counsel committed not to refile the claims against the County and the Sheriff (i.e., the Abbotts have agreed to dismissal of those defendants *with* prejudice), thereby eliminating any question about the finality of the district court's judgment and, accordingly, our appellate jurisdiction, 28 U.S.C. § 1291. *See, e.g., Arrow Gear Co. v. Downers Grove Sanitary Dist.*, 629 F.3d 633, 636-37 (7th Cir. 2010); *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 657-58 (7th Cir. 2010).

1244 (2012). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Anderson v. Creighton*, 483 U.S. 635, 646 (1987) ("The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably to anticipate when their conduct may give rise to liability for damages.'" (brackets and citation omitted)). To overcome the defendant's invocation of qualified immunity, the plaintiffs must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was "clearly established" at the time of the official's alleged misconduct. *E.g.*, *al-Kidd*, 131 S. Ct. at 2080; *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008). Though once required to determine whether a violation occurred before determining whether the right was clearly established, *see Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), courts now have discretion to grant immunity on the basis that the right was not clearly established without determining whether there was a violation in the first place, *see Pearson*, 555 U.S. at 227, *abrogating Saucier*, 533 U.S. at 200-01.

**A**

We begin with the Abbotts' false-arrest and false-imprisonment claims. The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006).

Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime. *See Thayer v. Chiczewski*, ___ F.3d ___, ___, Nos. 10-1974 & 10-2064, 2012 WL 6621169, at *6 (7th Cir. Nov. 27, 2012); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). As the term suggests, probable cause deals not with hard certainties but with probabilities. *Illinois v. Gates*, 462 U.S. 213, 231 (1983); *Suarez*, 581 F.3d at 595. Yet, although it requires something more than a hunch, probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable. *See Henry v. United States*, 361 U.S. 98, 102 (1959); *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). It is a practical, commonsense, nontechnical, and fluid conception that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *accord United States v. Reed*, 443 F.3d 600, 603 (7th Cir.

2006). Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996); *Tebbens v. Mushol*, 692 F.3d 807, 819 (7th Cir. 2012). Although our focus is on what the officer knew at the time of the arrest, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), we must determine whether those facts and circumstances, "'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Cognizant that police officers operate in the real world, often in rapidly unfolding and even chaotic circumstances, we view the facts not "'as an omniscient observer would perceive them but . . . as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard.'" *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010) (emphasis omitted) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)). Usually in a § 1983 false-arrest case the jury determines whether the arrest was supported by probable cause; but if the underlying facts are undisputed, the court can make that decision on summary judgment. *Chelios*, 520 F.3d at 686; *cf. Ornelas*, 517 U.S. at 691 (appellate courts review de novo ultimate question of probable cause).

The probable-cause standard inherently allows room for reasonable mistakes, *see Brinegar*, 338 U.S. at 176, but qualified immunity affords an added layer of protection by shielding officers from "suit for damages if 'a

reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (second alteration in original) (quoting *Anderson*, 483 U.S. at 641); *see, e.g.*, *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 880 (7th Cir. 2012). Often termed "arguable probable cause," *Thayer*, ___ F.3d at ___, 2012 WL 6621169, at *6, qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists, *Hunter*, 502 U.S. at 227. Though at first blush similar, the arguable-probable-cause inquiry is separate from the probable-cause inquiry, *Fleming*, 674 F.3d at 880; whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a "clearly established" constitutional right, *see Hunter*, 502 U.S. at 227; *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

The existence of probable cause or arguable probable cause depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law. *DeFillippo*, 443 U.S. at 36; *Thayer*, ___ F.3d at ___, 2012 WL 6621169, at *7. There is some dispute as to precisely what Deputy Sweeney told Travis he was being arrested for, but this is immaterial because an arrest can be supported by probable cause that the arrestee committed any crime, regardless of the officer's belief as to which crime was at issue, *Devenpeck*, 543 U.S. at 153; *Fox*, 600 F.3d at 837. It is similarly immaterial that Cindy was not informed of the basis for her arrest.

*See Devenpeck*, 543 U.S. at 155 ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required.").

**1**

Deputy Sweeney argues, and the district court concluded, that he had probable cause to arrest Travis either for assault or disorderly conduct (or both) under Illinois law. Whether Sweeney did, of course, depends on the facts known to him *at the time of the arrest*. *E.g.*, *Tebbens*, 692 F.3d at 816. There is no serious question that Travis was under arrest when Sweeney told him he was under arrest and placed him in handcuffs. *Cf. Hayes v. Florida*, 470 U.S. 811, 813-17 (1985); *Dunaway v. New York*, 442 U.S. 200, 206-16 (1979).

In Illinois, misdemeanor assault occurs when a person "knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a). Words alone seldom if ever are sufficient to constitute an assault; rather, there must be an accompanying gesture that is either inherently threatening or made so by the accompanying words. *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004) (Illinois law); *People v. Floyd*, 663 N.E.2d 74, 76 (Ill. App. Ct. 1996); *see Fox*, 600 F.3d at 838 (no probable cause where plaintiff's statement was not "accompanied by a threatening gesture, such as a raised fist"). And assault lies only if the threatening gesture creates in the victim an objectively reasonable apprehension of an imminent

battery. *See Kijonka*, 363 F.3d at 647-48; *Floyd*, 663 N.E.2d at 75-76.

We have little difficulty concluding that Sweeney had probable cause to arrest Travis for assault. When Sweeney arrived at the scene, Sergeant Lawley told him that Travis had threatened to wallop the animal control officers if they touched Biscuit and that Travis had made a fist while shouting at the officers. Thus, at the time of the arrest, Sweeney knew that Travis had threatened the animal control officers with words and at least one accompanying gesture; that the threats had been conditioned on the officers' successfully corralling Biscuit; and that the officers had considered the threats serious enough to warrant calling for police assistance. *See, e.g.*, *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (probable cause to arrest where plaintiff wielded lead pipe while threatening to kill victim); *People v. Preis*, 189 N.E.2d 254, 256-57 (Ill. 1963) (disgruntled client committed assault with intent to murder where she told lawyer that she was going to shoot him, placed her hand in her bulging coat pocket, and stood up); *People v. Ferguson*, 537 N.E.2d 880, 881-82 (Ill. App. Ct. 1989) (defendant committed assault when he reached into vehicle's trunk and threatened to "kick [victim's] ass").

It is true that Sweeney did almost no independent investigation after Sergeant Lawley apprised him of the situation, but he was not required to do so, because "[o]nce a reasonably credible witness informs an officer that a suspect has committed a crime, the police have

probable cause to arrest the suspect," *Mustafa*, 442 F.3d at 548; *see also Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) (probable cause to arrest plaintiff for trespass based on complaint; officers not required to verify that plaintiff had crossed property line). Travis makes no argument that it was unreasonable for Sweeney to rely on Lawley's information or for Lawley to rely on the animal control officers' complaint—that is, he makes no claim that those witnesses were not reasonably credible. *See, e.g.*, *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007) (officer entitled to rely on information from fellow law enforcement officer); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994) (officers entitled to rely on information from paramedic). And the only additional information Sweeney learned prior to the arrest came from Travis and corroborated much of what Sweeney had already been told.

Travis does not dispute any of this. Rather, he contends that there was no probable cause to arrest him for assault because he made the threats and gestures while he was inside the house, so he could not have placed the animal control officers in apprehension of an *imminent* battery. It is unclear whether Travis was inside the entire time he was making the threats—the record indicates that Travis did not lock himself inside the house until *after* Officer Moore had called the police, suggesting that he may have been outside beforehand, and Sergeant Lawley attested that when he arrived Travis was standing outside on the porch—but this lack of clarity in the record is not material. Even assuming that Travis was inside the house when he

made the threats and accompanying gesture, it is difficult to understand how Officer Moore's apprehension of a battery was any less imminent. The threat was conditioned on Moore touching or capturing Biscuit, which he was trying to do. Had the officer successfully corralled the dog, Travis could have made good on his threats simply by stepping outside and engaging the officer in fisticuffs—he retained control over his ability to carry out his threats. *Cf. People v. Kettler*, 459 N.E.2d 7, 11 (Ill. App. Ct. 1984) (no assault where arrestee had been strapped to gurney). In any event, Travis does not contend that Sergeant Lawley or anyone else *informed* Sweeney that Travis had made the threats and gestures while locked inside the house. *Cf. Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986) ("Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters."). Thus, even when viewing the facts in Travis's favor, Deputy Sweeney clearly had probable cause to arrest him for assault.

As if this were not enough, Deputy Sweeney also had probable cause to arrest Travis for disorderly conduct under Illinois law. *See* 720 ILCS 5/26-1(a)(1) ("A person commits disorderly conduct when he knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace . . . ."). In Illinois, "[t]o commit disorderly conduct, 'a person must engage in conduct that: (1) is unreasonable; (2) alarms or disturbs another; and (3) threatens to provoke or provokes a breach of the peace.'" *Thayer*, ___ F.3d at ___, 2012 WL 6621169, at *8

(citation omitted). The unreasonableness of the conduct depends on both the conduct itself and the circumstances in which the conduct occurs. *Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir. 1993). But the conduct at issue need not occur in the public square to threaten to provoke or to provoke a breach of the peace. *See People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980).

The Illinois Supreme Court has explained that the offense of disorderly conduct "is intended to guard against 'an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.'" *Id.* (citation omitted); *see also Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir. 2011) ("An arrest for disorderly conduct is justified when the defendant directly harasses or threatens other people." (citation omitted)). Deputy Sweeney reasonably could have concluded that Travis "molested or harassed" the animal control officers when he *threatened* to thump them if they succeeded in capturing Biscuit and that his vulgar threats and childish antics were unreasonable and threatened to provoke a breach of the peace. *See Davis*, 413 N.E.2d at 415-16 (defendant committed disorderly conduct by entering woman's home, waiving sheets of paper at her, and telling her that if her complaint were prosecuted he would carry out undefined threat); *In re D.W.*, 502 N.E.2d 419, 420-22 (Ill. App. Ct. 1986) (juvenile's statement to another juvenile that he was going to "kick his ass" constituted disorderly conduct); *see also Sroga v. Weiglen*, 649 F.3d 604, 606-07 (7th Cir. 2011) (probable cause to arrest for disorderly conduct where plaintiff jumped on top of car as it was being towed); *Biddle*, 992

F.2d at 677-78 (probable cause to arrest for disorderly conduct where plaintiff drunkenly had been screaming profanities and making violent arm gestures).

Travis contends, however, that his actions neither threatened to provoke nor actually provoked a breach of the peace. He relies on *People v. Trester*, 421 N.E.2d 959 (Ill. App. Ct. 1981), in which the court reversed a defendant's disorderly conduct conviction on the ground that the defendant's statement to a police officer—that if the officer "would take off his gun and badge, he, defendant, would punch [the officer] in the nose and they would fight," *id.* at 960—was "couched in terms of what might happen" and thus could not "be construed as an immediate threat," *id.* at 961. In effect, Travis makes an immediacy argument similar to that he made above, and just as before, this argument fails. Unlike *Trester*, in which the threat was contingent on the highly unlikely event that the officer would take off his gun and badge to rumble with the defendant, Travis's threat was contingent on the animal control officers successfully performing their official duty, capturing Biscuit. *Cf. Humphrey v. Staszak*, 148 F.3d 719, 728 (7th Cir. 1998) ("If an officer has reasonable grounds to believe that further trouble will ensue, he need not wait for the trouble to erupt, but may take lawful steps to prevent the problem."). Moreover, *Trester* has been called into question by the court that rendered it. *In re D.W.*, 502 N.E.2d at 422.

In any event, we are not concerned with whether Travis could have been convicted but only with whether Sweeney had probable cause to arrest him. *See Sroga*,

649 F.3d at 610 ("And 'to form a belief of probable cause, an arresting officer is not required . . . to act as a judge or jury to determine whether a person's conduct satisfies all of the essential elements of a particular statute.'" (citation omitted)). As indicated above, Sweeney had probable cause to arrest Travis for disorderly conduct; but even if he did not, he would be cloaked with qualified immunity because at the very least he had *arguable* probable cause. The most that Travis has established is that there is a conflict between *In re D.W.* and *Trester*. Therefore, even if we were inclined to find on this record that Sweeney did not actually have probable cause to arrest Travis for disorderly conduct (and we are not so inclined), Sweeney would be entitled to qualified immunity because a reasonable person could have reasonably concluded that there was probable cause based on the holding of *In re D.W.*, 502 N.E.2d at 420-22. *See Thayer*, ___ F.3d at ___, 2012 WL 6621169, at *6 ("'Qualified immunity protects police officers who reasonably interpret an unclear statute.'" (brackets omitted) (quoting *Mustafa*, 442 F.3d at 549)).

Deputy Sweeney had probable cause to arrest Travis for assault and for disorderly conduct. Therefore, the district court did not err in granting summary judgment for Deputy Sweeney on Travis's false-arrest and false-imprisonment claims.


**2**

Whether there was probable cause to arrest Cindy is a closer question. Sweeney maintains that he had probable

cause to arrest her for obstructing or resisting a peace officer. *See* 720 ILCS 5/31-1(a) ("A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor."). The district court agreed, concluding that there was probable cause that Cindy had attempted to help Travis escape and that she had also resisted arrest. Alternatively, Sweeney contends, and the district court also agreed, that he had arguable probable cause to arrest Cindy and is therefore cloaked with qualified immunity.

**(i)**

The district court's brief probable-cause analysis seems to have hinged on what it viewed as the following undisputed facts: Cindy was "running" toward Sweeney's squad car screaming while Travis was "going nuts" in the back seat of the squad car, and "Deputy Sweeney thought Cindy was trying to help Travis escape." The district court's analysis is flawed for several reasons. First, Cindy testified in her deposition that she was walking, not running, so viewing the facts in her favor, as we must, her *outward conduct* was not as aggressive as Sweeney's narrative suggests. Second, it is wholly irrelevant that Sweeney subjectively thought Cindy was trying to help Travis escape because the probable-cause inquiry concerns not what the officer actually believed but what a reasonable person in the officer's shoes would have believed. *See, e.g., Devenpeck,*

543 U.S. at 154-55; *Whren*, 517 U.S. at 813. (It is likewise irrelevant that Cindy's subjective intent was to move toward her own vehicle and not the squad car, as she does not dispute that the squad car was in between her and her vehicle.) Finally, and most importantly, the district court failed to consider the totality of the circumstances known to Sweeney at the time, focusing instead on only a small part of the overall picture. *Cf. Fox*, 600 F.3d at 834 (officers cannot close their eyes to information that cuts against probable cause).

Viewing all the facts in Cindy's favor without regard to the parties' subjective beliefs, a jury could conclude that no reasonable person could have believed Cindy was attempting to spring Travis. Recall that Cindy was instrumental in effectuating Travis's arrest; at Sweeney's request, she went into the house and persuaded Travis to come outside, thereby saving Sweeney from having to obtain an arrest warrant, *see Payton v. New York*, 445 U.S. 573, 576 (1980). Cindy did not put up a fuss when Travis was handcuffed and instead went inside to use the restroom. She became excited only after Sweeney backed into her vehicle, at which point she began screaming, "I can't believe you hit my vehicle!" She then "walked" toward the *driver's side* of the squad car as Sweeney was attempting to go to the *passenger's side* of the squad car to secure Travis. There was at least one other police officer on-scene, not to mention several animal control officers. And though not mentioned by either party, the record also demonstrates that Cindy was a petite woman, whereas Sweeney was a man of somewhat generous proportions, testifying that he

was 5'9" and 275 pounds at the time of his deposition. It is true that Travis was acting wildly in the backseat, but it is also true that, moments before, he had been yelling and cursing at Cindy. On this record, there are sufficient questions of fact upon which a jury could find that Sweeney lacked probable cause to arrest Cindy for attempting to help Travis escape.

The district court also concluded that Sweeney had probable cause to arrest Cindy for resisting arrest, based on the undisputed facts that she ignored Sweeney's order to stop and then ignored his order to get down on her stomach. As an initial matter, this account does not adequately consider Cindy's version of the incident by suggesting that Cindy was standing up when first ordered "to get down on her stomach"; her testimony (and Sweeney's) indicates that she was not ordered to get on her stomach until after being dropped to the ground by the first shot from the taser. More importantly, the district court failed to pinpoint the moment at which Sweeney arrested or attempted to arrest Cindy, which is necessary to determine whether her actions constituted resisting arrest. *See People v. Agnew-Downs*, 936 N.E.2d 166, 173-74, 176 (Ill. App. Ct. 2010).

An arrest, of course, is the archetypical "seizure" of a person under the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). A person is "seized" when his or her freedom of movement is terminated or restrained by intentionally applied physical force or submission to an assertion of authority. *Id.* at 626; *see*

*also Brendlin v. California*, 551 U.S. 249, 254 (2007); *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). A seizure rises to the level of an arrest "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003) (internal quotation marks and citation omitted). To determine if a seizure, including an arrest, has occurred, courts engage in an objective inquiry that presupposes an innocent person. *United States v. Drayton*, 536 U.S. 194, 202 (2002); *Florida v. Bostick*, 501 U.S. 429, 437-38 (1991).

It is clear that when Sweeney deployed his taser into Cindy's abdomen and zapped her with electricity, her freedom of movement was restrained to a degree that the law associates with formal arrest; so at that point she was arrested. *See, e.g.*, *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 484 (7th Cir. 2011) (successful seizure occurred when arrestee was incapacitated by pepper spray). But was she arrested before then? Whether she ran, walked, sauntered, or moseyed, it is undisputed that Cindy approached Sweeney's position. Sweeney claims that he ordered her to halt before shooting her with his taser, and this too is undisputed because Cindy does not remember one way or the other. This order, however, did not constitute an arrest as it was an assertion of authority to which Cindy did not submit. *See Hodari D.*, 499 U.S. at 629. Thus, Cindy was not under arrest before she was shot with the taser.

Furthermore, Cindy's alleged defiance of Sweeney's order to halt did not constitute resistance of an attempted arrest. Suppose Cindy had obeyed Sweeney's order and had stopped in her tracks—she would not have been deemed arrested or even seized at that point for the reason that Sweeney's order sought to prevent her from coming rather than going, that is, she was free to go anywhere in the world except closer to the squad car. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not *free to leave*." (emphasis added)); *see also Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). And even if she would not have felt free to leave the driveway—it was, after all, her home and a handful of strangers were present—a reasonable person in her position would have felt free to terminate the encounter by walking away. *See, e.g., Drayton*, 536 U.S. at 202 (explaining that if a person does not feel free to leave for reasons unrelated to the officer's presence, the inquiry shifts to whether a reasonable person under the circumstances would feel free to terminate the encounter with the officer). Indeed, a jury might conclude that under the circumstances Sweeney was really just trying to avoid a confrontation with Cindy over a collateral matter so that he could attend to what quite sensibly he viewed as the more important task, securing his prisoner. A jury could reasonably determine that, at the time he first deployed his taser, Sweeney lacked

probable cause to arrest Cindy for resisting arrest, inasmuch as there had been no arrest or attempted arrest prior to that point.

The district court also concluded that Cindy resisted arrest by failing to turn over onto her stomach. This alleged resistance occurred between the first and second jolts from the taser, so if this constitutes resisting arrest it was resistance of an unlawful arrest (based on our analysis up to this point). Illinois law is clear that a person violates section 5/31-1(a) if he or she resists or obstructs even an unlawful arrest made by a known peace officer. *Brooks*, 653 F.3d at 484; *see* 720 ILCS 5/7-7; *People v. Villarreal*, 604 N.E.2d 923, 926-28 (Ill. 1992). The effect of this rule on a § 1983 false-arrest claim was considered in a case where an officer went to the arrestee's home to arrest him pursuant to an allegedly unlawful warrant, and when the officer grabbed the arrestee's wrist to handcuff him, he broke free from the officer's grasp and began backpedaling, thereby prompting the officer to use pepper spray to subdue him. *Brooks*, 653 F.3d at 481-82, 485. We held that there was no need to determine whether the warrant had been obtained based on fabricated evidence "because, at the time [the arrestee] was seized, the officers had probable cause to arrest him for resisting a peace officer." *Id.* at 485. Critical to our analysis was the fact that the arrestee had avoided the officer's first attempt at a seizure by escaping the officer's initial grasp—this brief initial grasp was not sufficient to constitute an actual seizure because it did not significantly detain the arrestee. *Id.*; *see also Hodari D.*,

499 U.S. at 624-26 (seizure by physical force occurs where officer lays hands on suspect or otherwise applies physical force to restrain suspect's movement, even if suspect breaks free). The arrest occurred when the arrestee was subdued with pepper spray, and the arrestee's conduct up to that point provided probable cause to arrest him for resisting arrest. *Brooks*, 653 F.3d at 484-85. In the present case, however, Cindy remained in the clutches of the taser prongs continuously from the first jolt through the second jolt. The shot and accompanying first jolt of electric current was not a failed attempt at a seizure or a temporary seizure but a successful seizure that was not broken until later that night when Cindy walked out of jail. Unlike *Brooks*, where the probable-cause determination was made with reference to the second (and successful) attempted seizure, here the probable-cause determination must be made with reference to the first (and successful) attempt at a seizure, the initial deployment of the taser. And, as explained above, there was no probable cause at that time to justify arresting Cindy for resisting arrest.

### (ii)

Up to this point, we have constrained our analysis to the framework employed by the district court and have examined only whether Sweeney had probable cause that Cindy was committing obstruction *by trying to help Travis escape* or *resisting arrest*. The district court's analysis of Cindy's false-arrest claim was abbreviated, likely because the parties' submissions themselves

were scanty. The parties' lack of supporting case law is troubling because, as will soon be clear, this is not the first time that this court has been presented with a § 1983 false-arrest claim in which the defendant(s) claims that there was either probable cause or arguable probable cause to arrest the plaintiff for violating 720 ILCS 5/31-1(a); additionally, there is a considerable body of Illinois case law interpreting and applying this statute. To avoid misconstruing Illinois law, we will consider Cindy's false-arrest claim in the context of this case law.

Section 5/31-1(a) proscribes a vast array of conduct, not just attempting to spring someone from custody or resisting arrest. Specifically, a person commits obstruction or resistance of a peace officer when, (1) knowing that one is a peace officer, (2) he or she knowingly resists or obstructs (3) the officer's performance of an authorized act. 720 ILCS 5/31-1(a); *see Agnew-Downs*, 936 N.E.2d at 174-76. The Illinois Supreme Court has held that section 5/31-1(a) does "not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe[s] only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent[,] or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest[,] or physically aiding a third party to avoid arrest." *People v. Raby*, 240 N.E.2d 595, 599 (Ill. 1968) (internal quotation marks and citation omitted); *see People v. Weathington*, 411 N.E.2d 862, 863-64 (Ill. 1980); *see also Jones v. Clark*, 630 F.3d 677, 684-85 (7th Cir. 2011) (no arguable probable cause to arrest meter reader because there was no physical act); *Shipman v.*

*Hamilton*, 520 F.3d 775, 779 (7th Cir. 2008) (no probable cause where nurse never physically resisted officer); *Williams v. Jaglowski*, 269 F.3d 778, 781-83 (7th Cir. 2001) (no arguable probable cause where plaintiff merely refused to give officers her identifying information).[2] In view of the *Raby* standard, the inquiry here is whether at the time of the arrest a reasonable police officer could have believed that Cindy had undertaken (or was about to undertake) a physical act which imposed

---

[2] *Raby* held that both resisting and obstructing a peace officer require a physical act. 240 N.E.2d at 599 (noting that the terms "resist" and "obstruct" "are alike in that they imply some physical act or exertion"). But in a recent decision, the Illinois Supreme Court held that "obstructing a peace officer under section 31-1(a) . . . does not necessitate proof of a physical act, and that providing false information may constitute obstruction under section 31-1(a) when the misin-formation interposes an obstacle that impedes or hinders the officer and is relevant to the performance of his authorized duties." *People v. Baskerville*, 963 N.E.2d 898, 906 (Ill. 2012). In doing so, the court explained that "'resist' implies some type of physical exertion in relation to the officer's actions," *id.* at 905-06, but, "[a]lthough a person may commit *obstruction* of a peace officer by means of a physical act, this type of conduct is neither an essential element of nor the exclusive means of committing an *obstruction*," *id.* at 905 (emphases added). We express no opinion on the import of this decision because it was decided almost five years after the conduct in this case occurred (and thus could not have been known by a reasonable person in Deputy Sweeney's position).

an obstacle that impeded, hindered, interrupted, pre-
vented, or delayed Sweeney's performance of his autho-
rized acts.

Though capable of being stated succinctly, the *Raby*
standard for determining whether section 5/31-1(a)
has been violated has often proved difficult in applica-
tion. Perhaps the most straightforward cases of a
statutory violation are those in which a person physi-
cally scuffles with a police officer performing his or her
official duties or attempts to elude the police. *See, e.g.,*
*People v. Holdman*, 383 N.E.2d 155, 159 (Ill. 1978); *Raby*,
240 N.E.2d at 597, 602; *Agnew-Downs*, 936 N.E.2d at 176.
At the other end of the spectrum, the cases in which
the statute is not violated, are those involving only
verbal argument, *e.g., Jones*, 630 F.3d at 684-85; *Shipman*,
520 F.3d at 779; *People v. McCoy*, 881 N.E.2d 621, 630-
32 (Ill. App. Ct. 2008), refusal to identify oneself, *e.g.,*
*Williams*, 269 F.3d at 781-83; *Weathington*, 411 N.E.2d at
863-64, and refusal of officers' request to enter where
they have no right to do so, *e.g., People v. Cope*, 701 N.E.2d
165, 169-71 (Ill. App. Ct. 1998); *People v. Hilgenberg*, 585
N.E.2d 180, 183-86 (Ill. App. Ct. 1991).

The greatest difficulty lies in determining the point at
which mere verbal argument or refusal to act becomes
an act of physical resistance or obstruction. *See People v.*
*Ostrowski*, 914 N.E.2d 558, 571 (Ill. App. Ct. 2009)
("Passive acts that impede an officer's ability to perform
his duties, such as repeatedly refusing an officer's order
to exit a vehicle, may also violate section 31-1(a).");
*McCoy*, 881 N.E.2d at 637 (McDade, J., concurring in

part and dissenting in part) ("While section 31-1 does require an individual to comply with a peace officer's authorized actions, it does not call for complete and immediate submission."). *Compare Sroga*, 649 F.3d at 608 ("Although merely arguing with a police officer does not violate the statute, [plaintiff] both times went beyond argument by refusing to desist from behavior that was obstructing the efforts of the police to enable his car to be towed." (internal citations omitted)), *City of Chicago v. Meyer*, 253 N.E.2d 400, 402-03 (Ill. 1969) (affirming conviction where defendant refused to obey lawful order of dispersal after protest got out of hand), *People v. Gordon*, 948 N.E.2d 282, 287-88 (Ill. App. Ct. 2011) (affirming conviction where defendant refused lawful dispersal order and instead yelled profanities and threats at officers, while his cohort, who had been arrested, attempted to escape), *and People v. Martinez*, 717 N.E.2d 535, 538-39 (Ill. App. Ct. 1999) (probable cause to arrest where arrestee stood between officer and motorist that officer was attempting to question and where officer was unable to concentrate on questioning due to concern over arrestee's proximity), *with Gonzalez v. City of Elgin*, 578 F.3d 526, 538 (7th Cir. 2009) ("The [district] court thought that probable cause existed because each of these plaintiffs approached the defendant officers while those officers were attempting to arrest another of the plaintiffs. But, without more evidence, there is nothing wrong in itself with approaching a police officer."), *People v. Kotlinski*, 959 N.E.2d 1230, 1238-40 (Ill. App. Ct. 2011) (reversing conviction where defendant exited vehicle; officers ordered

him back into vehicle; defendant complied 21 seconds
later; and total elapsed time defendant was not in
vehicle was 47 seconds), *People v. Berardi*, 948 N.E.2d 98,
103-04 (Ill. App. Ct. 2011) (reversing conviction where
defendant had refused to leave private office space
in public building and instead had argued that he had
authority to be there; dispute lasted only a short time
and defendant then complied with officer's request), *and
People v. Stoudt*, 555 N.E.2d 825, 827-28 (Ill. App. Ct.
1990) (charges dismissed where defendants refused offi-
cer's dispersal order).

The kerfuffle here falls somewhere in this middle
ground. Cindy did not flee or physically clash with Swee-
ney, but along with arguing and yelling she did not
comply with his order to stop approaching. Reasonable
minds could differ as to whether Cindy's conduct was
more like that involved in cases like *Meyer*, 253 N.E.2d
at 402-03 (refusal to disperse), *Gordon*, 948 N.E.2d at 287-
88 (refusal to disperse and threatening officers while
cohort attempting to escape), and *Martinez*, 717 N.E.2d
at 538-39 (physical proximity interfered with officer's
questioning of third party), and therefore violated
section 31-1(a), or whether it was more akin to the
conduct involved in cases like *Gonzalez*, 578 F.3d at 538
(nothing inherently wrong with approaching officers while
they were attempting to arrest others), *Kotlinski*, 959
N.E.2d at 1238-40 (incident occurred over less than a
minute), *Berardi*, 948 N.E.2d at 103-04 (refused officer's
order to leave office building and kept arguing), or
*Stoudt*, 555 N.E.2d at 827-28 (refusal to disperse when
ordered), and therefore not a crime.

But we need not determine whether there was probable cause, for the simple fact that reasonable minds could differ as to the meaning of the law leads to the conclusion that Sweeney is shielded by qualified immunity. *See Hunter*, 502 U.S. at 229 ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley*, 475 U.S. at 341, 343)); *Thayer*, ___ F.3d at ___, 2012 WL 6621169, at *6 ("'Qualified immunity protects police officers who reasonably interpret an unclear statute.'" (brackets omitted) (quoting *Mustafa*, 442 F.3d at 549)). Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. *E.g.*, *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Cindy has done neither. Therefore, the district court did not err in granting summary judgment to Sweeney on Cindy's false-arrest and false-imprisonment claims.

**B**

Although fatal to the Abbotts' false-arrest and false-imprisonment claims, the existence of probable cause (or arguable probable cause) to arrest does not affect their excessive-force claims, given that the reasonableness of an arrest or other seizure under the Fourth Amendment depends not only on *when* it is made but also on *how* it

is made, *see Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Put differently, even when an officer has probable cause to arrest, the Fourth Amendment prohibits him from employing "'greater force than [is] reasonably necessary to make the arrest.'" *Gonzalez*, 578 F.3d at 539 (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)).

A claim that an officer employed excessive force in arresting a person is evaluated under the Fourth Amendment's objective-reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam); *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989); *Garner*, 471 U.S. at 7-12. The reasonableness standard is incapable "of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). It requires courts to "'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott*, 550 U.S. at 383 (brackets omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

In judging the reasonableness of any particular use of force, we consider factors such as the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers or others, and whether he or she is actively resisting arrest or attempting to flee and evade arrest. *Graham*, 490 U.S. at 396; *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). The reasonableness of the force used depends on the totality of the facts and circumstances known to the officer at the

time the force is applied. *Garner*, 471 U.S. at 8-9; *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). It is an objective inquiry, the dispositive question being "'whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner,'" *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)), irrespective of the officer's underlying intent or motivation. *See Graham*, 490 U.S. at 397; *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). In answering this question, we remain cognizant of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. As a result, we "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009).

Qualified immunity, in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force. *See Saucier*, 533 U.S. at 204-05. This is so because, even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful—i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was "clearly established." *See, e.g.*, *al-Kidd*, 131 S. Ct. at 2080. A constitutional right is "clearly established" for qualified-

immunity purposes where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see also United States v. Lanier*, 520 U.S. 259, 270 (1997); *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010). "In other words, 'existing precedent must have placed the . . . constitutional question beyond debate.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quoting *al-Kidd*, 131 S. Ct. at 2083).

Travis and Cindy both limit their excessive-force claims to Deputy Sweeney's use of his taser on them. Before addressing the merits of their contentions on appeal, it is useful to pin down the quantum of force exacted by Sweeney's taser, which represents the nature and significance of the governmental intrusion on their Fourth Amendment interests. *See Phillips*, 678 F.3d at 521; *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). Although Deputy Sweeney used the same device, a model X26 Taser,[3] on both Cindy and Travis, he did not employ it in the same manner—he used the taser in dart mode on Cindy and in drivestun mode on Travis. In dart mode, the X26 uses compressed nitrogen to propel two "probes" toward the target at somewhere between 160 and 180 feet per second. The probes are aluminum darts tipped with steel barbs and are connected to the device by insulated wires, which are about twenty-five

---

[3]  For an explanation of the origin of the term "Taser," see, for example, *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 n.3 (6th Cir. 2012).

feet in length. Once the probes strike the target, the officer pulls the trigger and the device delivers 50,000 volts of electric current, but the amount of voltage that enters the target's body is closer to 1200 volts. These high-voltage electric waves "overpower the normal electrical signals within the [target's] nerve fibers"; they "override the central nervous system[ ] and take[ ] direct control of the skeletal muscles." "The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010) (footnotes omitted) (same model); *see also Draper v. Reynolds*, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004) (similar description of the model M26 Taser). In drivestun mode, however, the officer does not fire probes at the target but instead presses the device's electrodes directly to the target's body and pulls the trigger to deliver the electric current. When utilized in this manner, the X26 does not override the target's central nervous system. *See Brooks v. City of Seattle*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) (same model), *cert. denied sub nom. Daman v. Brooks*, 132 S. Ct. 2681, *and cert. denied*, 132 S. Ct. 2682 (2012). Rather, it "becomes a pain compliance tool with limited threat reduction."

This court has acknowledged that "one need not have personally endured a taser jolt to know the pain that must accompany it," *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009), and several of our sister circuits have likewise recognized the intense pain inflicted by a taser, *see, e.g., Bryan*, 630 F.3d at 824 ("The tasered person

also experiences an excruciating pain that radiates throughout the body."); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) ("[A] stun gun inflicts a painful and frightening blow [that] temporarily paralyzes the large muscles of the body, rendering the victim helpless."); *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008) (same). Accordingly, we have held that, even though it is generally nonlethal, the use of a taser "is more than a *de minimis* application of force," *Lewis*, 581 F.3d at 475, but we have also acknowledged that the use of a taser, like the use of pepper spray or pain-compliance techniques, generally does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles, *Phillips*, 678 F.3d at 521. The use of a taser, therefore, falls somewhere in the middle of the nonlethal-force spectrum. *See Bryan*, 630 F.3d at 826 (describing the X26 in dart mode as "an 'intermediate or medium, though not insignificant, quantum of force'" (citation omitted)). Indeed, the Sangamon County Taser Policies and Procedures and the Use of Force Scale place tasers at an intermediate level of force, on par with pepper spray. *Cf. Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) ("[I]nfliction of pepper spray on an arrestee has a variety of incapacitating and painful effects, and, as such, its use constitutes a significant degree of force." (internal citation omitted)). That said, when used in dart mode, the X26 "intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not. While pepper spray causes an intense pain and acts upon the target's physiology, the effects of the X26 are not limited to the target's eyes

or respiratory system." *Bryan*, 630 F.3d at 825; *cf. Oliver v. Fiorino*, 586 F.3d 898, 903-04 (11th Cir. 2009) (after being tased at least eight times over a two-minute period, decedent "died as a result of 'ventricular dysrhythmia in conjunction with Rhabdomyolisis' as a result of 'being struck by a Taser' ").

## 1

Deputy Sweeney argues, and the district court held, that he is entitled to qualified immunity on Travis's excessive-force claim because he did not violate clearly established law. Alternatively, Sweeney contends that use of the taser under the circumstances was reasonable so there was no constitutional violation in the first place. We need not examine whether Sweeney's use of the taser on Travis was reasonable because we agree with the district court that use of the taser under these circumstances did not violate clearly established law.

The facts viewed in Travis's favor appear to show that, as Sweeney was backing out of the driveway, Travis was fidgeting around in the backseat and successfully maneuvered his cuffed hands from behind his back to the front of his body. In his submissions to both the district court and this court, Travis does not dispute that Sweeney's squad car lacked a partition between the front and back seats (though Travis testified otherwise in his deposition). Travis also does not dispute that he was "going nuts" in the backseat of the car when Sweeney first encountered Cindy, though he does deny

unfastening his seatbelt and reaching for the door (but how he maneuvered his cuffed hands around his body with a seatbelt on is a mystery). After finishing with Cindy, Travis continues, Sweeney opened the rear, passenger-side door and got on top of Travis, "dropped an elbow on [Travis's] throat," and began applying the taser to Travis's body in drivestun mode. And Travis claims further that Sweeney pulled him from the car, threw him on the ground, gave him "the knee bomb," and tased him three more times on his back. Travis denies that he was acting wild when Sweeney came to deal with him, but he admits that he "was trying to fight with" Sweeney in the back of the police cruiser and at one point was "out powering" the deputy. Neither Travis nor Sweeney can recall the number of times the taser was applied to Travis, but they seem to agree that there were multiple applications of short duration (Travis said "little second bursts").

On appeal, Travis does not challenge Sweeney's initial use of the taser, arguing instead that Sweeney violated clearly established law in tasing him multiple times after he had been subdued by the first tasing.[4] Travis

---

[4] Travis's concession that the first tasing did not violate clearly established law helps to resolve an ambiguity in his deposition testimony. It is possible to view Travis's testimony to convey that the only fight he put up was to defend himself against excessive force. And if that were so, our case law holds that use of unnecessary force on one who resists only that force can constitute excessive force. *See Morfin v.*

(continued...)

claims that the subsequent taser applications were excessive because he had been subdued by the first tasing and he was already handcuffed and in custody. *See, e.g.*, *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001). He marshals three pepper-spray cases from other circuits to support his position, but while those cases support the general proposition that it is excessive to use such force on a subdued suspect, the arrestees in those cases, unlike here, were actually subdued. *See Tracy*, 623 F.3d at 98-99 (jury could find application of pepper spray to be unreasonable where plaintiff claimed he had already been handcuffed and was not resisting); *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006) (officer not entitled to qualified immunity at summary judgment where jury could find that he had applied pepper spray to nonresisting plaintiff's face while plaintiff was lying on his stomach and handcuffed with his hands behind his back); *Vinyard v. Wilson*, 311 F.3d 1340, 1347-49 (11th Cir. 2002) (officer not entitled to summary judgment where he had pulled over and applied pepper spray while arrestee was yelling and arrestee had been arrested for minor offenses, was handcuffed and secured

---

[4] (...continued)
*City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (reversing summary judgment for officers where "[i]t was only after the officers took [plaintiff] to the floor that [he] crossed his arms on his chest to prevent the officers from handcuffing him"). But as Travis has not challenged the initial use of the taser on him, we do not view his testimony about fighting with Sweeney to be so limited.

in backseat of police car, posed no threat to the officer or herself, and there was a partition separating her from the officer). Unlike the arrestees in these three cases, even Travis admits that he continued fighting with Sweeney after the first application of the taser, so he was not subdued. And even though he was handcuffed, he had moved his hands to the front of his body, which allowed him to overpower Sweeney at times.

Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable. *See Clarett v. Roberts*, 657 F.3d 664, 674-75 (7th Cir. 2011) (affirming defense verdict where defendant used taser three times on plaintiff when she blocked the doorway to her son's bedroom after several officers had entered and defendant heard a commotion in the bedroom and believed officers needed help; the second and third tasings were deployed because plaintiff was kicking and flailing and continuing assaultive behavior as defendant was arresting her); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (use of taser on defendant was reasonable where defendant had "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"); *Forrest v. Prine*, 620 F.3d 739, 745-46 (7th Cir. 2010) (affirming summary judgment for officer on plaintiff's Fourteenth Amendment excessive-force claim, where plaintiff was a large man in a confined area who was intoxicated, defiant, belligerent, was clenching his fists and yelling obscenities, and had attacked another officer earlier

that evening); *see also Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509-10 (6th Cir. 2012); *Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012); *Hoyt v. Cooks*, 672 F.3d 972, 979-80 (11th Cir. 2012); *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011); *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993). Insofar as Travis continued to resist after the first tasing, Deputy Sweeney did not violate clearly established law by using the taser in drivestun mode several more times until Travis was subdued.

Furthermore, although Travis claims that Sweeney pulled him from the car, threw him on the ground, gave him "the knee bomb," and tased him three more times on his back, he does not contend that he had ceased resisting or fighting with Sweeney at that point. Indeed, it is undisputed that Sweeney used the taser until Travis stopped fighting but did not use it thereafter, suggesting that Sweeney used no more force than was necessary to gain control of the actively resisting Travis. And even assuming that Travis had ceased resisting prior to these last three tasings, Deputy Sweeney reasonably could have believed that Travis had not ceased resisting. *See Brooks*, 653 F.3d at 487 ("[C]ontrolling law would not have communicated to a reasonable officer the illegality of applying pepper spray to an arrestee who has ceased active, physical resistance for a couple of seconds but has not submitted to the officer's authority, has not been taken into custody and still arguably could pose a threat of flight or further

resistance.”); *see also Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009).

Thus, even viewing the facts in a light favorable to Travis,[5] Deputy Sweeney did not violate clearly established law when he used his taser, so he is entitled to qualified immunity.

---

[5] Deputy Sweeney’s expert, Travis Dalby, testified that, taking Travis’s deposition at face value, Sweeney’s use of the taser was not warranted. When asked about this at oral argument, Sweeney’s counsel responded that the court cannot look just at Travis’s testimony but must view all of the facts. While it is true that summary judgment involves examination of all the parties’ evidence, Fed. R. Civ. P. 56(c)(1), Sweeney misses the point that on summary judgment any conflicts are resolved against the moving party, so Dalby’s comment might have been used to resist summary judgment for Sweeney. That said, Travis has never identified this portion of Dalby’s testimony in any of his submissions to the district court or to this court, *see FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) (limiting review to adequately supported facts in FTC’s Local Rule 56.1 statement), and Travis has not given any reason as to why we should exercise our discretion to look beyond the properly submitted materials and consider other matters in the record, *see* Fed. R. Civ. P. 56(c)(3) (“The court need consider only the cited materials, but it may consider other materials in the record.”). In point of fact, after oral argument Sweeney’s counsel submitted a letter to the court pursuant to Appellate Rule 28(j) addressing this very issue, and Travis never submitted anything to the contrary.

**2**

Cindy's excessive-force claim again presents a closer question. Cindy, like Travis, does not challenge the first tasing on appeal. With regard to the second tasing, Deputy Sweeney contends that he did not violate clearly established law because Cindy failed to follow his orders to roll over and then attempted to stand up. But there is a factual dispute over whether Cindy attempted to stand up or whether she did not move, and we must view the facts in her favor. The district court acknowledged that Cindy testified she was unable to move, but it concluded that this was irrelevant because the reasonableness of the force used is determined from the officer's perspective and there was no dispute that Cindy failed to comply with Sweeney's command.

**(i)**

The facts viewed in a light favorable to Cindy show that Cindy became excited and upset when Sweeney backed into her car. She began screaming about her car and walking toward it to inspect the damage. Deputy Sweeney interpreted her actions, perhaps unreasonably (as previously noted), as her attempting to help Travis escape, so he ordered her to stop but she kept walking. As she was walking toward her vehicle she was, without warning, shot with a taser in dart mode and fell to the ground in immense pain. After she was on the ground, Sweeney came closer and shouted orders for her to turn over onto her stomach, but she did not comply and did not move, so he zapped her again and then he

turned her over onto her stomach. The record is unclear as to the duration of each tasing and the time between the first and the second jolts.[6]

Because Cindy does not challenge the first tasing, we assume without deciding that it was reasonable under the Fourth Amendment or at least that a reasonable officer could have believed that it was reasonable. But the fact that an initial use of force may have been

---

[6] The record contains an exhibit, attached to Sweeney's deposition transcript, that appears to be a printout of the date, times, and duration of each trigger pull for an X26. This exhibit indicates that on June 25, 2007, an X26 with serial number X00-093461 was fired seven times between 12:17:40 and 12:19:14. Assuming that this is an accurate and complete printout for the taser that Sweeney used on Cindy and Travis, it indicates that Cindy was tased at 12:17:40 for 3 seconds and at 12:17:50 for 6 seconds and that Travis was tased five times between 12:18:00 and 12:19:14 for 5 seconds each time. This, however, is mere conjecture because the record contains no foundational evidence linking this exhibit to the taser used by Sweeney or verifying that it is an accurate and complete record. During Sweeney's deposition, the Abbotts' counsel asked him to explain this exhibit because counsel did not know what it was; Sweeney responded, "I do not [know] either." And Sweeney's expert, Travis Dalby, was never asked about this exhibit. Perhaps this is why the parties do not mention the exhibit in their submissions to this court. Indeed, at oral argument, Sweeney's counsel responded to a question about the timing set forth in this exhibit by saying that there was nothing in the record about the timing of the tasings.

justified does not mean that all subsequent uses of that force were similarly justified. *See Phillips*, 678 F.3d at 525-26. Rather, "[f]orce is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force. . . .  It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (citations omitted).

The totality of the circumstances, when viewed in a light favorable to Cindy, demonstrates that Sweeney's second application of the taser could be determined by a jury to have been unreasonable. Cindy was shot in dart mode both times, which caused her to lose control of her skeletal muscles, a very significant intrusion on her Fourth Amendment interests. *See Bryan*, 630 F.3d at 826; *Lewis*, 581 F.3d at 475-76; *see also Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (describing taser fired in dart mode as a "quite severe" intrusion on Fourth Amendment interests). And none of the three *Graham* factors provide a justification for the second tasing. As we explained earlier, Sweeney had arguable probable cause to believe that Cindy had obstructed a peace officer, a Class A misdemeanor, *see* 720 ILCS 5/31-1(a), which is not a serious or violent crime. *See Cyrus*, 624 F.3d at 863 & n.7 (criminal trespass, entry onto construction site, or resistance or obstruction of peace officer, were all misdemeanors under Wisconsin law and thus minor); *cf. Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (lesser degree of force reasonable when offense is minor and not committed

violently). Moreover, there is absolutely no evidence that Cindy posed a threat to Sweeney, herself, or anyone else, especially after the first tasing when she was lying on her back on the ground and not moving. *See Cyrus*, 624 F.3d at 863. And although she did not comply with Sweeney's order to turn over onto her stomach after the first tasing, she did not move and at most exhibited passive noncompliance and not active resistance. *See Phillips*, 678 F.3d at 527 ("Permitting substantial escalation of force in response to passive non-compliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts."); *cf. Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("[T]he use of pepper spray 'may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.'" (emphasis and citation omitted)).

In short, there are no countervailing governmental interests that come close to off-setting the substantial intrusion on Cindy's Fourth Amendment interests exacted by the second tasing. Indeed, courts generally hold that it is unreasonable for officers to deploy a taser against a misdemeanant who is not actively resisting arrest. *See Cyrus*, 624 F.3d at 862-63 (jury reasonably could find the use of taser to be excessive: Cyrus's disobedience of officer's commands could be interpreted in several ways—e.g., a jury could conclude that his barrel-

roll down the driveway was an involuntary response to being tased twice; Cyrus had committed at most a misdemeanor under Wisconsin law; and there was absolutely no evidence that Cyrus had violently resisted the officer's attempts to handcuff him); *Lewis*, 581 F.3d at 473-79 (reversing summary judgment for officer on presentencing detainee's Fourteenth Amendment excessive-force claim, evaluated under Eighth Amendment standard, where detainee "was prone on his bed, weakened, and docile" when ordered to get out of bed and when he turned toward officers to explain that he was too weak to get up he was shot with taser without warning); *Schneider v. Love*, No. 09 C 3105, 2011 WL 635582, at *7 (N.D. Ill. Feb. 10, 2011) ("Although this is a close case, on the facts assumed to be true, it was unreasonable to continue to hit, kick, and tase plaintiff after the first tasing. It should have taken only seconds to realize plaintiff was subdued. It will be a fact question for the jury as to when defendant should have recognized plaintiff was subdued. Further tasing or punching after that point would not be reasonable."); *see also Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496-98 (6th Cir. 2012); *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012); *Mattos v. Agarano*, 661 F.3d 433, 448-52 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2682, *and cert. denied*, 132 S. Ct. 2684 (2012); *Brooks v. City of Seattle,* 661 F.3d at 443-46; *Fils v. City of Aventura*, 647 F.3d 1272, 1288-90 (11th Cir. 2011); *Bryan*, 630 F.3d at 826-32; *Cavanaugh*, 625 F.3d at 665-66; *Oliver*, 586 F.3d at 905-07; *Brown v. City of Golden Valley*, 574 F.3d 491, 496-98 (8th Cir. 2009); *Parker v. Gerrish*, 547 F.3d 1, 9-11 (1st Cir. 2008); *Casey*, 509 F.3d at 1282-83.

We are mindful that Deputy Sweeney acted in a rapidly unfolding situation and that officers are to be given leeway under those circumstances. But Sweeney attempts to transform the circumstances into much more than they really were. Although he reasonably believed that Travis was attempting to escape, it is undisputed that Travis could not open the car door from the inside. And had he escaped, it is unlikely he would have gone far because Sergeant Lawley or the animal control officers could have intercepted him—this is not the case of a single officer attempting to control and detain multiple suspects. Furthermore, Travis was not a violent criminal who had been arrested for a violent crime; rather, he simply had been acting foolishly, albeit criminally. Because the *Graham* balance tips so heavily in Cindy's favor, we do not think that the rapidly unfolding nature of these relatively innocuous events tips the balance the other way. *Cf. Deorle*, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."); *accord Phillips*, 678 F.3d at 525.

### (ii)

Although Cindy has made out a constitutional violation, she must also show that the right that Sweeney violated was clearly established on June 25, 2007, the date of the incident. To determine whether a right is clearly established we look to controlling precedent from both the

Supreme Court and this circuit, and if there is no such precedent we cast a wider net and examine "all relevant case law to determine 'whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Phillips*, 678 F.3d at 528 (quoting *Estate of Escobedo*, 600 F.3d at 781); *see Pearson*, 555 U.S. at 244 (officers were entitled to rely on cases from other circuits even though their own circuit had not yet addressed the issue). Importantly, the right must be clearly established in a particularized sense, rather than in an abstract or general sense. *Brosseau*, 543 U.S. at 198; *Anderson*, 483 U.S. at 639-40. "But a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Phillips*, 678 F.3d at 528 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see, e.g.*, *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992).

The Supreme Court has not addressed an excessive-force claim based on the use of a taser and the most analogous case from this circuit is *Cyrus*, which was decided in 2010 and did not consider qualified immunity. And although we cited several cases from other circuits holding that officers had used excessive force in deploying tasers under circumstances similar to those here—a misdemeanant who is not actively resisting—all of those cases were decided after June 25, 2007. The Ninth Circuit has held that the absence of any case law involving tasers means that officers are entitled

to qualified immunity. *See, e.g.*, *Mattos*, 661 F.3d at 452. But, as the Sixth Circuit has explained, just as defining a right too broadly may defeat the purpose of qualified immunity, defining a right too narrowly may defeat the purpose of § 1983. *Hagans*, 695 F.3d at 508-09. Moreover, we have explained that "[e]very time the police employ a new weapon, officers do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided." *Phillips*, 678 F.3d at 528 (citing *Sallenger v. Oakes*, 473 F.3d 731, 741-42 (7th Cir. 2007)).

Turning to the present case, we conclude that it was clearly established on June 25, 2007, that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over. Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects. *See, e.g.*, *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (jury could find that officers used excessive force in grabbing plaintiff and throwing him to the floor, where plaintiff had not been a threat to officers, was docile and cooperative, and did not resist in anyway until the officers applied unnecessary force); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (not objectively reasonable for officer to apply overly tight handcuffs, where arrestee was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with . . . minor

offenses"); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) ("The Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs."). Rather, only a minimal amount of force may be used on such arrestees. *See Smith v. Ball State Univ.*, 295 F.3d 763, 766, 770 (7th Cir. 2002) (not excessive force for officers to use "straight arm bar" technique to remove nonresponsive driver from automobile, where, although driver was not actively resisting, officers reasonably believed him to be intoxicated and behind the wheel of a running vehicle); *see also McAllister*, 615 F.3d at 885-86 (distinguishing *Smith*).

It is true that Cindy had already been tased once when the second taser jolt was delivered, and because she does not challenge the initial jolt we assume without deciding that the first tasing did not violate clearly established law. But even so, it was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued. *See, e.g., Dye*, 253 F.3d at 298 ("shooting a disarmed and passive suspect is a clear example of excessive force"); *Henderson*, 439 F.3d at 502-03; *Vinyard*, 311 F.3d at 1347-49; *cf. Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). And viewing the facts in Cindy's favor, there is no question that she was in fact subdued

by the first tasing—she immediately fell to the ground and convulsed but made no movement after the first tasing ended. *Cf. Johnson*, 576 F.3d at 660-61 (use of police dog to subdue purportedly surrendering suspect was objectively reasonable because it would not have been clear to reasonable officer that suspect's surrender was genuine). In contrast to the situation posed by Travis, no reasonable officer could have understood Cindy's conduct after the first tasing, as she describes it, to be active physical resistance. *Cf. Brooks*, 653 F.3d at 487.

To be sure, an officer will not be held liable if the circumstances under which the force was used evolved so rapidly that a reasonable officer would not have had time to recalibrate the reasonable quantum of force. *See, e.g.*, *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (officer entitled to qualified immunity where on a dark, rainy night she had "fired a fusillade in an emergency situation" at a large man running toward her with a hammer raised in the air, and she had continued firing after the man went to the ground, but the entire incident lasted ten seconds); *Hathaway v. Bazany*, 507 F.3d 312, 321-22 (5th Cir. 2007) (objectively reasonable for officer to respond with deadly force in limited time available where vehicle he had stopped began accelerating toward officer as he approached vehicle on foot). But this is not such a case. Even Deputy Sweeney's testimony indicates that, after the first tasing ended, he approached Cindy, ordered her to roll over, and then tased her the second time because she did not roll over. Put differently, he did not squeeze the taser trigger a second time because events unfolded so rapidly that he was

unable to appreciate that Cindy was subdued; he tased her the second time because she did not comply with his command to roll over. *Cf. Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) (plaintiff stated plausible excessive-force claim based on officer having shot him multiple times after he had been incapacitated by first shot, where there was time for officer to realize that plaintiff had already been subdued by first shot).

Finally, several post-2007 decisions lend further support to our conclusion that, on the facts viewed in Cindy's favor, Deputy Sweeney violated clearly established law in applying the second taser jolt. In 2009, we found that it had been clearly established in 2006 that a taser could not be used against a prone, weakened, and docile prisoner who had been told to rise one time, had not been warned that failure to comply would result in use of a taser, and had been zapped before having a chance to comply with the order to rise. *Lewis*, 581 F.3d at 479. If it was clearly unlawful in 2006 to use a taser on a moving prisoner who had been ordered to rise, then it surely was clearly unlawful a year later to use a taser on a noncompliant, nonmoving misdemeanor arrestee who had already been immobilized by an initial taser jolt. *Cf. Bell v. Wolfish*, 441 U.S. 520, 544-48 (1979) (discussing limitations on convicted prisoners' and pretrial detainees' constitutional rights). And more recently, we held that it was clearly established in 2005 that officers could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders. *Phillips*, 678 F.3d at 528-29. Additionally, since 2007, many of our

sister circuits have found the use of a taser against nonviolent, nonresisting misdemeanants to violate clearly established law, the absence of taser case law notwithstanding. *See Austin*, 690 F.3d at 498-99; *Shekleton*, 677 F.3d at 367; *Fils*, 647 F.3d at 1292; *Oliver*, 586 F.3d at 907-08; *Brown*, 574 F.3d at 499; *Casey*, 509 F.3d at 1286.

In short, a genuine issue of material fact exists that must be resolved by a jury, so summary judgment on this claim was improper. Although the issue of qualified immunity ordinarily should be resolved " 'at the earliest possible stage in litigation,' " *Saucier*, 533 U.S. at 201 (citation omitted), this is one of the unusual cases in which a definitive decision on the issue cannot be had without further factual development, *see, e.g.*, *Estate of Escobedo v. Martin*, ___ F.3d ___, ___, No. 11-2426, 2012 WL 6199155, at *6 n.4, *13-17 (7th Cir. Dec. 13, 2012); *Warlick v. Cross*, 969 F.2d 303, 305-10 (7th Cir. 1992).

### III

For the foregoing reasons, we AFFIRM the district court's entry of judgment in Deputy Sweeney's favor on all of Travis Abbott's claims and on Cindy Abbott's false-arrest and false-imprisonment claims, but we VACATE the judgment on Cindy's excessive-force claim and REMAND for further proceedings.